### WRIGHT et al. v. UNITED STATES.
### No. 17850.

United States Court of Claims.

Decided March 6, 1951.

---

Special Findings of Fact.

1. On January 21, 1944, a fire occurred in dormitory No. 9 of the Evans Hall housing project, located in Evansville, Indiana. Orlin C. Wright and Charles W. Mills, war workers and tenants in the dormitory, died on January 21 and 22, 1944, respectively, of burns sustained in the fire. Plaintiffs, Maud M. Wright and Maxine Roberts, formerly Maxine Mills, were the wives respectively of Orlin C. Wright and Charles W. Mills at the time of their deaths and are the persons named in Senate Resolution 227, 80th Congress, 2d Session, agreed to May 10, 1948, which reads: "*Resolved,* That the bills H. R. 1226 and S. 1585, for the relief of Mrs. Maud M. Wright and Mrs. Maxine Mills, with the accompanying papers, are hereby referred to the Court of Claims in pursuance of section 151 of the Judicial Code, Twenty-eighth United States Code, section 257, for such action as the court may take in accordance therewith."

H.R. 1226 and S. 1585, 80th Congress, 1st Session, which are identical, read in part: "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Mrs. Maud M. Wright, Robinson, Illinois, the sum of $5,000, and to Mrs. Maxine Mills, Robinson, Illinois, the sum of $5,000. The payment of such sums shall be in full settlement of all claims against the United States of the said Mrs. Maud M. Wright for the death of her husband, Orlin C. Wright, on January 21, 1944, and of the said Mrs. Maxine Mills for the death of her husband, Charles W. Mills, on January 22, 1944, both of whom died as the result of burns sustained in a fire at the Evans Hall housing project, Evansville, Indiana, which was under the supervision and management of the National Housing Agency: * * *."

2. After the reference of bills H.R. 1226 and S. 1585 to this court through Senate Resolution 227, the plaintiffs filed a petition in this court in which, as a basis for recovery, negligence on the part of the defendant was alleged as follows: "That the said Orlin C. Wright and Charles W. Mills lost their lives as the direct and proximate results of the negligence of the defendant in failing to erect and construct proper and adequate fire escapes to the second floor of the dormitory in which the husbands of the plaintiffs herein lost their lives by the burning of the same, and the said defendant, after said fire did construct and erect proper and adequate fire escapes to the second floors of the dormitories which were not burned; that said defendant was further negligent in failing to provide a proper and adequate number of fire extinguishers and have such proper and adequate number of fire extinguishers properly placed in the dormitory which burned; that the said defend-

ant was also negligent in knowingly permitting the use of an electric hot-plate by one Leonard Vaughn, a tenant of the dormitory which burned, the use of such electric hot-plate being prohibited by the Rules and Regulations of the said Evans Hall housing project, which Rules and Regulations said defendant negligently failed to enforce, although the use of the said hot-plate was known to said defendant through its representatives and manager thereof; that said defendant was also negligent in knowingly permitting the installation and operation of improper heavier electric fuses which would not blow out as quickly as proper lighter electric fuses when the electric wiring system in said dormitory was overloaded; that as the direct and proximate result of the negligence of said defendant the said Orlin C. Wright and Charles W. Mills lost their lives as hereinabove set forth."

3. The Evans Hall housing project was constructed by the War Department at or about the beginning of World War II for use by civilian war workers. In February 1942 this project along with various others was transferred to the National Housing Agency which was operating it on January 21, 1944, when the fire in question occurred. The project included various dormitories, of which dormitory No. 9 in which the fire occurred was one. Dormitory No. 9 was a standard type dormitory which was built during that period. It was approximately 100 feet in length and was two stories in height with a corridor extending its entire length through the center of each floor. On each side of the central corridor the space was partitioned off into separate rooms without cooking facilities.

Dormitory No. 9 had an entrance door on the first floor at each end of the building and an entrance door in the middle on the first floor opposite a stairway leading to the second floor. It had an entrance door at each end of the building on the second floor leading to exterior stairways which went from each of these entrances to the ground level. It was a frame building with drop-siding exterior (wood exterior with strips of wood overlapping one another), two by four studs, two by six joists, and ceiling rafters. The interior walls were lined throughout with pressed cane fibreboard ¾ths inch thick with the exception of the boiler room which was lined with a cement asbestos material known as "Transite."

4. Tenants, upon admission to the Evans Hall housing project, were required to sign a form known as "Revocable Use Permit to War Worker," which contained the following provisions:

"The United States of America, hereinafter called the 'Government', does hereby grant to ——————— hereinafter called the 'Occupant', a person engaged in national-defense activities, as defined in Public No. 849, 76th Congress, approved October 14, 1940 (as amended), the revocable privilege to occupy the following described premises, located in the County of Vanderburgh, State of Indiana, subject to the covenants and conditions hereinafter contained, and to the terms and conditions on the back hereof: [room number of occupant]

"It is understood and agreed that the revocable privilege hereby granted includes only the authority to use the said premises for residential purposes of the Occupant, in accordance with such rules and regulations as may be promulgated by the Government, and that it does not authorize the Occupant to alter or change in any manner the said premises, or remove any fixtures or equipment.

\* \* \* \* \* \*

Terms and Conditions.

\* \* \* \* \* \*

"2. *Responsibility.*—Tenants shall be responsible for the proper care and use of items in their possession and of community facilities used by them. The tenant shall immediately report any loss or damage of fixtures and furnishings. No tenant shall attempt to make repairs of any kind. All replacements and repairs shall be made by the Management, and those resulting from carelessness or negligence shall be made at the tenant's expense.

\* \* \* \* \* \*

"8. *Liability.*—The Management will not be responsible for lost or stolen personal property or for personal injury sustained on the project.

"9. *Fire Hazards.*—Tenants shall permit nothing to be done on the project premises or bring or take anything thereon which will in any way increase the fire risk or in any way conflict with the rules and ordinances of the local fire department.

\* \* \* \* \* \*

"17. *Use of Electricity.*—Tenants shall not waste electricity. Electricity may be used by dormitory tenants for the operation of radios. Electricity may be used by trailer occupants for the operation of radios, percolators, toasters, and clocks, but written permission to use electricity for all other appliances (such as hand vacuum cleaners) not provided by the project must be obtained from the Manager. No appliance rated at more than 500 watts shall be used.

" 18. *Other.*—The Management reserves the right to make such other rules and regulations from time to time as it may deem needful and appropriate for the safety, care, and cleanliness of the premises and for securing the comfort and convenience of all tenants."

Use permits of the character referred to above were signed by Orlin C. Wright and Charles W. Mills whose deaths occurred as a result of the fire in question, and by Leonard Vaughan, referred to in finding 8.

5. House rules were prepared by the management of the housing project and copies of these rules were posted on the bulletin board located in dormitory No. 9 as well as in a clearly visible place on the walls in each of the rooms in the dormitory. These rules were in substance a recapitulation of the terms and conditions of the revocable use permit described in finding 4, and included the following:

"9. *Liability.*—The Management will not be responsible for lost or stolen personal property or for personal injury sustained on the project.

"10. *Fire hazards.*—Tenants shall permit nothing to be done on the project premises or bring or take anything thereon which will in any way increase the fire risk or in any way conflict with the rules and ordinances of the local fire department.

\* \* \* \* \* \*

"13. *Use of electricity.*—Tenants shall not waste electricity. Electricity may be used by dormitory tenants for the operation of radios."

Leonard Vaughan did not read or pay any attention to the use permit referred to in finding 4, or to the house rules referred to above.

The defendant, through the National Housing Agency and its servants, was in full control of the project including the individual rooms of the dormitories.

6. At the time of the fire in question on January 21, 1944, the housing project was operated under the supervision of a manager who had held that position since August 1943. Shortly after he became manager he prepared the house rules referred to in the preceding finding and caused them to be posted on the bulletin boards and in the various rooms of the buildings, including dormitory No. 9. In connection with his work as manager, he held regular staff meetings with the personnel which came under his supervision, including the maids of the several dormitories. At one of these meetings which was held about a week or ten days prior to the fire in question, the manager discussed, among other things, the fire hazards in these buildings, the location of the fire extinguishers, the system of reporting fires and what precautions were to be taken in case of fire.

7. The rooms occupied by the tenants in dormitory No. 9 were swept and dusted daily and mopped on occasions as needed by the dormitory maid. While cleaning the dormitory rooms, the maids were instructed not to disturb the personal possessions of the tenants any more than was absolutely necessary and not to go into their personal baggage or dresser drawers. They were, however, instructed to report

any violations of the house rules, including the use of hot plates by the tenants.

8. Orlin C. Wright and Charles W. Mills, the individuals who lost their lives in the fire in question, and Leonard Vaughan were tenants of the Evans Hall housing project occupying rooms in dormitory No. 9. Vaughan occupied a room in the southwest corner of the first floor and Wright and Mills occupied a room in the southeast corner on the same floor.

9. On one occasion prior to January 21, 1944, the senior maid at the Evans Hall housing project reported to the manager that she thought she knew where there was at least one dormitory in which a tenant might be making coffee. The manager instructed her that it was part of her responsibility to follow up such matters, that the regulations of the project were posted, and if she had specific and positive information of violations it was her responsibility to follow up with notice to the tenant of the violation. No other information or suggestion that the rules of the project were being violated by the use of hot plates was received by the manager prior to the fire on January 21, 1944.

However, approximately three weeks before the fire, the senior maid found an electric hot plate on the dressing table in the room occupied by Leonard Vaughan in dormitory No. 9. She told Vaughan that it was against the regulations to have a hot plate in his room and instructed the maid who regularly cleaned the rooms on that floor in the dormitory to be on the lookout for a hot plate. Whatever report, if any, the senior maid made of this incident did not come to the attention of the manager. The maid who cleaned Vaughan's room daily did not see a hot plate in his room until the morning of January 21, 1944, when she was cleaning his room a short time before the fire occurred. However, she did not have an opportunity before the fire occurred to report this.

After the senior maid had warned Vaughan as to the use of the hot plate as set out above, she, on another occasion, suspected him of using it but, upon being questioned in regard to its use, Vaughan denied that he had been using a hot plate. A reasonable conclusion from the evidence is that Vaughan—at least from the occasion when the hot plate was first discovered in his room by the senior maid until the fire—had had the hot plate in the room but had usually kept it concealed from view.

10. About noon on January 21, 1944, Vaughan plugged a hot plate into the electrical outlet in his room in dormitory No. 9 for the purpose of warming some coffee. In addition he placed a quart glass jar containing cold packed meat and grease near the burner. The jar had a cap thereon. At or shortly thereafter, he left the room, closed the door, and went to the bathroom which was located near the center of the building. Shortly after he left his room the jar of meat exploded, the grease therein ignited and started a fire in the room. A few minutes later Vaughan came out into the hall from the bathroom and saw fire coming out under the door to his room. He rushed to the room, disconnected the hot plate and put it under the bed, and attempted to get water to put on the fire. Vaughan was in the building fighting the fire for a period of from fifteen to twenty minutes before he was forced to leave because of the heat and smoke. Vaughan was assisted in his efforts to combat the fire in Vaughan's room by the janitor, Ben Wood. Wood attempted to use a waste basket to put out the fire instead of the fire extinguisher which was very close by and in operating condition. Wood then became confused, gathered his own clothing from his room in dormitory No. 9 and fled from the premises. Wood was so frightened that he failed to return to the project until the following afternoon. There is a conflict in the testimony as to whether Wood was just entering the building, or whether he was inside the building at the time he first received notice of the fire, but it is a reasonable conclusion that he knew of the existence of the fire about the same time that Vaughan discovered it. When Vaughan was unsuccessful in stopping the fire, he left the room and went out of the building. At or about

the same time, the local fire department was called. When the fire department arrived, the fire had made considerable headway, due in part to the fact that a wind was blowing from the direction of Vaughan's room to the opposite end of the building, and in part, to the fact that there was an unexplained delay in calling the local fire department. The fire was extinguished before all of the building was consumed. The bodies of Orlin C. Wright and Charles W. Mills were found in the room or in the corridor near the room which they occupied on the first floor on the opposite end of the dormitory from where the fire started.

11. Four fire extinguishers, each of water type with a capacity of about two and one-half gallons, were located in dormitory No. 9: one at each of the exits on each floor at the ends of the building. These fire extinguishers had been placed in wall brackets, waist high, and were checked daily by project watchmen for water content. One of the fire extinguishers was located in the hall within four or five feet of the room occupied by Vaughan and it was found in its wall bracket and in operating condition after the fire had been extinguished. Neither Vaughan nor Wood, the janitor, undertook to make any use of this fire extinguisher.

12. The adequacy or inadequacy of the fire extinguishers or fire escapes, or the character of the electric fuses used, had no causal connection with the deaths of Mills and Wright.

13. At the time of his death, Orlin C. Wright was fifty-seven years of age and was making an annual wage of between $2,500 and $2,600; and at the same time, Charles W. Mills was twenty-six years of age and was making an annual wage of between $3,100 and $3,200. Before and at the time of their deaths, they were supporting their respective families.

14. Orlin C. Wright and Charles W. Mills lost their lives in the fire described above through no fault or negligence of their own.

## Conclusion of Law.

Upon the foregoing findings of fact the court concludes that as a matter of law plaintiffs would have had a just and legal claim against the United States if at the time the events occurred on January 21, 1944, the United States had been suable in an action for negligence sounding in tort. Consent for the Government to be sued in such cases was given in Title IV of the Act of August 2, 1946, Federal Tort Claims Act, 60 Stat. 842, 843, 28 U.S.C.A. § 1346(b). The court further concludes that even if the above statute had been in effect on January 21, 1944, the plaintiffs' claim would have been barred by the Indiana statute of limitations at the expiration of two years from that day. Any payment, therefore, made by the authority of Congress upon plaintiffs' claim would be in the nature of a gratuity.

Lawrence J. Simmons, Washington, D. C., for plaintiffs. John I. Nevin, Washington, D. C., and Charles E. Jones, Robinson, Ill., were on the briefs.

Benton C. Tolley, Jr., Washington, D. C., with whom was Asst. Atty. Gen. H. G. Morison, for defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

HOWELL, Judge.

This matter is referred to us by Senate Resolution 227, 80th Congress, 2d Session, agreed to May 10, 1948, which reads: *"Resolved,* That the bills H.R. 1226, and S. 1585, for the relief of Mrs. Maud M. Wright and Mrs. Maxine Mills, with the accompanying papers, are hereby referred to the Court of Claims in pursuance of section 151 of the Judicial Code, Twenty-eighth United States Code, section 257, for such action as the court may take in accordance therewith."

H.R. 1226 and S. 1585, 80th Congress, 1st Session, which are identical, have previously been quoted, in part, in a finding of fact.

Sections 2509 and 1492 of 28 U.S.C.A. supersede Section 151 of the Judicial Code. Sections 1492 and 2509 provide as follows:

Sec. 1492:

"The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress."

Sec. 2509:

"Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

"The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

Plaintiffs' petition is brought to recover $5,000 each for the deaths of Orlin C. Wright and Charles W. Mills. Their deaths allegedly resulted from the negligence of the defendant. Plaintiffs, Maud M. Wright and Maxine Roberts, formerly Maxine Mills, were the wives respectively of Orlin C. Wright and Charles W. Mills at the time of their deaths and are the persons named in Senate Resolution 227, 80th Congress, 2d Session, agreed to May 10, 1948, and by which reference was made to this court of the bills for the relief of plaintiffs.

The decedents lost their lives as the results of burns sustained in a fire occurring January 21, 1944, in dormitory No. 9, Evans Hall housing project, Evansville, Indiana, which was under the supervision and management of the National Housing Agency. It was constructed by the War Department at or about the beginning of World War II for the purpose of housing civilian war workers. In 1942 this project along with various others was transferred to the National Housing Agency which was operating it on January 21, 1944, when a fire occurred in dormitory No. 9, which was a standard type of dormitory, approximately 100 feet in length, 2 stories in height, with a corridor extending its entire length through the center of each floor (Finding 3). On each side of the corridor the space was partitioned off into separate rooms. No housekeeping or cooking facilities were provided.

Tenants, upon admission to the Evans Hall project, were required to sign a form known as "Revocable Use Permit to War Worker" (Finding 4), which form was signed by the decedents and Leonard Vaughan, in whose room the fatal fire originated. Among other things, the terms and conditions of this use permit required that the occupants report any loss or damage of furnishings and fixtures; that only defendant could make repairs; and that occupants were prohibited from bringing anything on the premises which would increase the fire risk or conflict with the rules and ordinances of the local fire department. Dormitory occupants were allowed to use electricity for the operation of radios and such other appliances as were authorized by written permission from the Manager, and defendant reserved the right to make such rules and regulations deemed necessary for the care and safety of occupants. The rules and regulations which were made by the management incorporated substantially the same terms and conditions as were in the use permit, and these rules and regulations were posted on the bulletin boards in various places in the dormitory.

On January 21, 1944, the housing project was operated under the supervision of a manager who had held the position since August 1943, and who, after he became manager, prepared the house rules mentioned above, posted them in the various places, and held regular staff meetings with the dormitory personnel, at

which meetings the rules and regulations were discussed. At one such meeting, which was held a week or 10 days prior to the fire, the fire hazards in the buildings, the location of the fire extinguishers, the system of reporting fires, and the precautions which were to be taken in the case of fire, were discussed.

The defendant provided daily maid service to all the rooms in the dormitories, which service consisted of sweeping and dusting and an occasional mopping of the floors by the dormitory maids. The maids were instructed to report any violation of the rules and regulations, including the use of hot plates. They were also instructed that while they were engaged in their duties they were not to disturb the personal possessions of the tenants any more than was absolutely necessary, and not to go into their personal baggage or dresser drawers.

Orlin C. Wright and Charles W. Mills, who lost their lives in the fire involved, occupied a southeast corner room on the first floor and Leonard Vaughan occupied a southwest one on the same floor.

Shortly before noon on January 21, 1944, Vaughan, according to the testimony, plugged in his hot plate to warm some coffee, and placed nearby a sealed quart jar of cold meat. He then left the room and went to the bathroom, which was near the center of the building. Shortly after he left, the jar of cold meat exploded, the grease ignited and set the room on fire. A few minutes later, Vaughan came out into the hall from the bathroom and observed the fire coming out under the door of his room. He rushed into his room, disconnected the hot plate, put it under his bed and attempted to get water from the bathroom to put on the fire. According to the testimony, Vaughan was in the building combating the fire for a period of from 15 to 20 minutes before he was forced to leave due to the heat and smoke, at which

time he left the room and went out of the building. At or about the same time, the local fire department was called. Vaughan was assisted in his efforts to extinguish the fire by the janitor, Ben Wood,[1] who was just entering or was already inside the building when he learned of the fire. The janitor, although he had been employed for some time, and had attended the various meetings held under the direction of the project manager at which the combating of fire hazards as well as the location of the fire extinguishers were discussed, used a wastebasket in attempting to extinguish the fire instead of the fire extinguisher which was located within four or five feet of the room occupied by Vaughan, which extinguisher was found in its wall bracket in an operating condition after the fire had been extinguished. The evidence further discloses that Wood became confused, gathered his clothing from his own room from the same dormitory, fled from the premises, and did not return until the following afternoon.

When the fire department arrived, the fire had made considerable headway due, in part, to the fact that a wind was blowing from the direction of Vaughan's room to the opposite end of the building. While the fire was extinguished before all of the building was burned, the bodies of Orlin C. Wright and Charles W. Mills were found in the room or in the corridor near the room which they occupied on the first floor on the opposite end of the dormitory from where the fire started.

In view of the facts in this case, the character of the relationship between the decedents and the defendant would more nearly resemble a lodginghouse keeper and lodger rather than as landlord and tenant.

As a lodger in dormitory No. 9, Evans Hall project, Evansville, Indiana, the decedents merely had the use of the rooms without the exclusive possession and re-

---

1. Because of the obvious importance of the testimony of Ben Wood, the janitor, and the fact that he was not called to testify at the hearing held before the Commissioner, this case was re-referred to the Commissioner for the purpose of taking such testimony. However, it was discovered that Wood had died in the meantime, and that his testimony was therefore unavailable.

sponsibility for the care and condition thereof which is necessary to a landlord and tenant relationship. Although the technical relationship of innkeeper and guest may not have existed between defendant and the decedents inasmuch as defendant was not operating an inn or a hotel in the sense that it did not maintain this lodginghouse as a public place where all transient persons might be received and entertained as guests, it, nevertheless, furnished rooms for the habitation and enjoyment thereof by plaintiffs, while it, the defendant, maintained the responsibility for the care thereof, and the exclusive possession and control over the rooms. Hercules Powder Co. v. Crawford, 8 Cir., 163 F.2d 968; Roberts v. Casey, 36 Cal.App.Supp.2d 767, 93 P.2d 654.

■ Although a lodginghouse keeper is not an insurer of the safety of his guests, he has a duty to do those things which are reasonably necessary for the safety and protection of his guests. Strahl v. Miller, 97 Neb. 820, 151 N.W. 952, affirmed 239 U.S. 426, 36 S.Ct. 147, 60 L.Ed. 364; Knott Corporation v. Furman, 4 Cir., 163 F.2d 199; Bell v. Daugherty, 199 Iowa 413, 200 N.W. 708, 37 A.L.R. 154; Pierce v. Burlington Transportation Company, 139 Neb. 423, 297 N.W. 656 and Carpenter v. Syrett, 99 Utah 208, 104 P.2d 617.

■ In the case at bar, the manager, maids, and janitor were employees of the United States and the servants thereof, and as such, negligence imputable to them is also imputable to the United States. Meagher v. United States, 86 Ct.Cl. 450.

Evidence has been introduced in connection with the degree of care which the servants took to enforce the house regulations. There were provisions in the form known as "Revocable Use Permit to War Worker" as well as the house rules posted in various places, including dormitory No. 9, which dealt with fire hazards and the use of electricity. The maids were instructed that, among other things, the use of hot plates was a violation of these rules and that any such violation should be reported. Approximately three weeks before the fire, the senior maid found an electric hot plate on the dressing table in the room occupied by Vaughan in dormitory No. 9. She told Vaughan that it was against the regulations to have a hot plate in his room and instructed the maid who regularly cleaned the rooms on that floor to be on the lookout for a hot plate. Whatever report, if any, the senior maid made of this incident did not come to the attention of the manager. The maid who cleaned Vaughan's room daily did not see a hot plate in his room until the morning of January 21, 1944, when she was cleaning his room a short time before the fire occurred. However, she did not have an opportunity to report it before the fire began.

On another occasion, previous to this, the maid suspected Vaughan of using a hot plate and upon being questioned, Vaughan denied its use.

■ It would appear therefrom that sufficient incidents had occurred previous to the fire to place defendant on notice that Vaughan was violating the house rules. It was incumbent upon the defendant to ascertain this and to take the necessary steps to relieve this hazard. It is well settled that negligence may consist of failure to use care in inspecting the premises upon which servants are employed, or in supervising their conduct. The duty of defendant was not performed merely by supplying the servants with proper instructions or making suitable regulations. The defendant was under a continuous duty of inspection and was required to give such attention to the lodginghouse as would normally guard against injuries to lodgers. Had due care been exercised in this situation, means would have been taken to determine with certainty the use of a hot plate in Vaughan's room and the removal of it, or of Vaughan, would have been effectuated.

■ Defendant contends that there was no proximate cause established between the deaths of the decedents and its failure to enforce the fire regulations and that the proximate cause was the negligent and careless acts of the tenant Vaughan.

However, the presence of the hot plate was the instrumentality which was the initial force which caused the fire and Vaughan would not have had a hot plate to use if the regulations and the instructions had been enforced. Vaughan's acts were made possible by the lack of due care on the part of defendant.

Defendant has cited Wilcox v. Urschel, 101 Ind.App. 627, 200 N.E. 465, in support of the proposition that where injury is due to two distinct successive causes which are unrelated in operation and where one is prior, passive, or a remote cause merely furnishing a condition or giving rise to occasion making injury possible, and the other is an active, direct, independent, effective, and intervening cause, courts look to the latter as the proximate cause. Although this court agrees that an independent, intervening, responsible agent may sever the line of causation from the original negligence, the facts here do not warrant the application of this principle. In the Wilcox case, a demurrer was sustained to a complaint which alleged a cause of action for personal injuries against a third person to an automobile collision. Said person had permitted a hedge fence to grow to an unlawful height on his lands at the intersection of the highways where the accident took place. The court, however, found that the height of the hedge was not the proximate cause of the injury for which complaint was made. It is sufficient to note that these facts are not analogous to the ones before this court.

Nor are we able to agree with defendant that decedents assumed the risk of burning to death because they signed and agreed to the "Revocable Use Permit" which stated that the management would not be responsible for personal injury sustained on the project. Decedents did not sign the permit on the assumption that defendant would fail to exercise that degree of care required of it. Decedents did not know that Vaughan possessed or used a hot plate nor did they deliberately expose themselves to danger and assume the risk. The senior maid in failing to remove the hot plate or to report its existence to the manager so that he could have it removed, and the failure of the manager to more carefully enforce the rules and regulations are illustrative of defendant's negligence, which is imputed to it through its servants.

This court, in Gulf Transit Co. v. United States, 43 Ct.Cl. 183, discussed the general principles of exculpatory clauses where the government relied upon a clause which read, "The U. S. Government will assume no responsibility for any damage or injury to a vessel, her crew, or appurtenances while she is entering, leaving, or while she is in dock." The court said, 43 Ct.Cl. at page 199: "But this does not mean, and cannot be construed to mean, that the defendants need not perform their part of the contract by exercising ordinary diligence and skill in disposing of the vessel while it was in their hands. A much more reasonable construction will be to say that the Government will assume no responsibility for the acts of the owners' agents or for the acts of third persons, * * *; but to hold that this rule authorized the government's agents to do what they pleased * * * would, in effect, be to construe a contract so that one party should be wholly exempt from liability for his own nonperformance or for defective performance. This would clearly be against public policy and needs no citation of authorities to support it, * * *."

The duty of a lodginghouse keeper to exercise ordinary care for the safety of his guests extends to warning the lodger seasonably of a danger of which the lodginghouse keeper is aware. However, from the state of the record before us, it is difficult to ascertain whether or not the janitor Wood, was actually in the building a sufficient length of time to seasonably warn the decedents. There is some testimony to the effect that he was in the building at about the same time that Vaughan discovered the fire, and it further appears that he did have time to go to the washroom in the center of the building, attempt to fill a wastebasket with water, and return to assist in fighting the fire, thence to his room to

954

gather his belongings, prior to fleeing from the premises. It also appears from the evidence that two of the maids who were in the building at the time the fire was discovered warned all of the tenants on the second floor in time to make their escape from the building. It is in this respect that the testimony of the janitor, Wood, would have contributed to the state of the record, but, as we pointed out above, his testimony was not available.

■ However, we have found that the defendant was negligent, that defendant is liable for the negligence of its servants in failing to enforce its safety regulations, and that such failure was the proximate cause of the deaths.

■ Section 2509 of 28 U.S.C.A. directs the court to inform Congress whether the demand is legal or equitable, or be a gratuity. The law contemplates that if, upon the record and the present state of the law, equities are indicated either by the findings of fact or the law, or both, the court will call attention to these facts. Congress then can determine whether they are of a nature which should persuade it to act upon the claim in the light of the considered and informed judgment of this court as to the nature and scope of the equities, Burkhardt v. United States, 82 F.Supp. 333, 113 Ct.Cl. 115.

■ In this case, it must be conceded that plaintiffs have a cause of action upon which recovery could be had in a court of law were the defendant an individual instead of the United States, and if, the plaintiffs had brought their action within the time limit of the applicable statute of limitations. It is noted that Indiana has statutorily provided that a wrongful death action must be commenced by the personal representative of the decedent within two years after the wrongful death, which time has, of course, long since expired. Therefore, whether these plaintiffs are to be compensated by the Government for the negligent conduct of its servants is a matter exclusively for the determination of Congress.

It is ordered that the foregoing special findings of fact, conclusion of law and opinion of the court be transmitted to the Senate, in accordance with the Act of March 3, 1911, 36 Stat. 1087, as amended by the Act of June 25, 1948, 28 U.S.C.A. §§ 1492, 2509.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.