75 N.J. Super. 56 (1962)
182 A.2d 157
EDGAR W. JOHNSON, PLAINTIFF-RESPONDENT,
v.
JOHN KOLIBAS AND SUSIE KOLIBAS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted on February 13, 1962.
Decided June 12, 1962.
*58 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. John A. McKenna attorney for appellants (Mr. John T. Keefe, of counsel).
Messrs. Seaman & Williams attorneys for respondent (Mr. Albert W. Seaman, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
Defendants John Kolibas and Susie, his wife, owners and proprietors of a tavern and a rooming *59 house at 41-43 Pershing Avenue, Carteret, N.J., appeal from a final judgment of $5,000 entered in the Middlesex County Court on a jury verdict in favor of plaintiff Edgar W. Johnson, one of their former roomers. Defendants also appeal from the denial of their motion for a new trial and arrest of judgment. The judgment received by Johnson was for personal injuries he sustained on December 11, 1957, while escaping from the rooming house during a fire.
The tavern is located on the first floor and is operated by John Kolibas. He and his wife maintained their living quarters in an apartment on the second floor. There were also located on the second floor six separate bedrooms, which were rented to roomers on the date of the fire, and a common bathroom located off the hall.
Frank Derczo rented a room next to Johnson's. He awoke in the early morning hours of the day in question, lit a cigarette, then left his room, closing the door behind him, to go to the common bathroom. He returned approximately ten minutes later, opened the door, and saw that his room was filled with smoke and flames. He testified that "I just stood there for a second and I saw Mr. and Mrs. Kolibas in the hall. They asked me what was going on and I didn't know myself." Realizing that there was a fire Derczo began to make a "noise" and "banged on some of the doors" of other roomers. He did not testify that he had "banged" on Johnson's door. When the hall began to fill with smoke, he broke through a locked door at the end of the hall and went down a stairway that led to the street. Derczo stated that the hall was well lighted. He was asked if there was any obstruction between the door of Johnson's room and defendants' when he first saw them standing in the hall at their apartment door. His reply was, "Not that I know of."
Jacque Pinto lived in a corner room adjoining Derczo's room. He stated that he was awakened by the smoke and then heard Mrs. Kolibas shout, "Pete, fire." He was frightened by the fire when he opened the door to his room. He *60 then heard Mrs. Kolibas call out, "Pinto." He remained by the window of his room until two firemen with a ladder assisted him out of the building through the window.
Johnson, a bartender, had returned to his room about 10:30 P.M. the evening preceding the fire. He went to bed and put out his light shortly thereafter. His room was located between Derczo's and the Kolibas' apartment. Plaintiff was aroused from his sleep, wondering why he was "sweating, kind of hot." He then got out of bed to go to the bathroom. Johnson opened the door leading to the hall and immediately closed it as "the flame and smoke shot in and chased me back again." He opened it again, but the flames and smoke were "getting worse." He inhaled "a stomach full [of smoke] and nearly passed out from it." Johnson ran across his room, opened the window, and saw flames and smoke coming "from Derczo's window around to mine." He explained that:
"I put my head out the window for a while and I figured somebody would come to get me out of there. But it got so hot in there that I couldn't stand it, so I put my leg out on the little roof over the door and I tried to get on there but I couldn't. The flames and heat got so bad there that I couldn't hold on no longer. I hung on the ledge and I dropped on the sidewalk there."
Plaintiff dropped from his hanging position on the ledge, fell backwards and sustained personal injuries to his head, back and legs. He was later treated for smoke poisoning and burns at a hospital where he remained for about two weeks.
On the question of whether he received any warning as to the fire, Johnson testified on direct examination as follows:
"Q. From the time you opened your door until the time you went to the window and yelled for help before you jumped, did you see anyone?
A. I didn't see anyone.
Q. Did you in fact talk to anyone?
A. I didn't talk to anybody.
*61 Q. Did anyone knock on your door?
A. Nope.
Q. Did anyone yell to you?
A. No.
Q. There was just utter silence?
A. That's right.
Q. Did you hear anybody talking?
A. I didn't hear anything.
Q. Did you hear any yelling?
A. Nothing."
On cross-examination he stated that he did not see Mr. Kolibas when he went to his door because "I couldn't see through the smoke and the flames." Nor did he remember Kolibas speaking to him "because I couldn't get out there to talk to anybody."
Johnson explained that he rented his room by the week. In return for his rent defendants supplied him with a furnished room, bed linen, towel and soap. Mrs. Kolibas made his bed and "straightened the room each day." She also gave the room a general cleaning once a week. He was not, however, supplied with any food.
John Kolibas testified that his wife awakened him at the time of the fire, crying, "I smell something, smoke." He and his wife went to the door leading to the hall, and saw Johnson and Derczo standing in front of their rooms. On cross-examination he was unable to tell whether Johnson was dressed or not, and, if dressed, the clothing he was wearing. He testified that he called to Johnson, "Eggs [his nickname], run on down [,] come on this way." He did not see Pinto. The smoke was then concentrated near Derczo's room, but he was unable to say whether the door from Derczo's room was closed or open. Kolibas went back into his room, put on his trousers and slippers, took a box containing the tavern's receipts, and, with his wife, went out into the hall, leaving the house by the same rear exit as did Derczo. Kolibas corroborated Johnson's testimony as to the daily and weekly cleaning by Mrs. Kolibas of plaintiff's room. Mrs. Kolibas did not testify.
*62 Michael A. Yarcheski, the health officer of the township, testified that defendants operated a licensed boarding house.
Plaintiff does not charge defendants with any negligence relating to the origin of the fire. He conceded that defendants operated "a clean boarding house" and that the fire probably originated from a lighted cigarette in Derczo's room. The theory of liability is based on failure to warn plaintiff of the fire in order that he could have had an opportunity to escape by some means other than jumping from his window.
Defendants contend that the trial court erred in failing to dismiss plaintiff's case and in denying their motion for a new trial because: (1) plaintiff failed to prove any duty owed to him by defendants which they violated; (2) the evidence showed that defendants did not have reasonable time in which to warn plaintiff or abate the condition without jeopardizing their own lives, if any duty did exist; (3) defendants' failure, if any, to warn plaintiff was not the proximate cause of plaintiff's injuries. Defendants also allege that Johnson was a tenant, not a roomer, and therefore not owed as high a duty of care as would be owed to a roomer or lodger.
We must first dispose of defendants' contention that Johnson was only a tenant, not a roomer. One who hires a room or rooms in a building owned by another will be considered a tenant if he is to have the exclusive possession and control of the hired premises. Byrd v. Feilding, 238 S.W.2d 614, 616 (Tex. Civ. App. 1951); Taylor v. Dean, 78 A.2d 382, 383 (D.C. Mun. Ct. App. 1951); Carroll v. Cooney, 116 Conn. 112, 115, 163 A. 599, 600 (Sup. Ct. Err. 1933); 1 American Law of Property, § 3.7, p. 192 (1952). The chief distinction between a tenant and a lodger or roomer lies in the character of their possession. The criterion is the right of exclusive possession. While the tenant has exclusive legal possession of the premises, the lodger only has the right to use the premises, subject to the landlord's retention of control and right of access *63 to them. Stowe v. Fritzie Hotels, 44 Cal.2d 416, 421, 282 P.2d 890, 893 (Sup. Ct. 1955); Roberts v. Casey, 36 Cal. App. Supp.2d 767, 771, 93 P.2d 654, 657-8 (Super. Ct. 1939).
A rooming house was described in City of Independence v. Richardson, 117 Kan. 656, 659, 232 P. 1044, 1046 (Sup. Ct. 1925) as follows:
"* * * a rooming house is merely a house or building where there are one or more bedrooms which the proprietor can spare for the purpose of giving lodgings to such persons as he chooses to receive. A rooming house is not necessarily a public place to which any well-behaved person of means can go and demand lodgings as a matter of right, as he can do at a hotel. The keeper of a rooming house may receive whom he will, reject whom he will, and usually he makes special contracts with each of his guests concerning compensation and length of stay."
Cf. Pierro v. Baxendale, 20 N.J. 17, 23-24 (1955). See also Cedar Rapids Invest. Co. v. Commodore Hotel Co., 205 Iowa 736, 740, 218 N.W. 510, 512, 56 A.L.R. 1098, 1101 (Sup. Ct. 1928), where the court stated:
"A rooming house is usually a house where bedrooms as such are furnished. It is not ordinarily expected that housekeeping, light or heavy, or the preparation or enjoyment of meals, will take place there, or that the room will be used to any considerable extent as a sitting room. * * * The room in a rooming house is usually in the immediate possession (when the occupant is not there), and dependent on the care of the proprietor."
The characteristics normally associated with a roomer or lodger vis-a-vis a tenant are collected in a note entitled, "Tenant, Lodger, and Guest: Questionable Categories for Modern Rental Occupants," 64 Yale L.J. 391, 393-4 (1955), where it was pointed out that:
"The occupant has exclusive possession only if the owner has not retained a right to enter the premises during occupancy. Courts have considered a variety of factors as indicating that the occupant was not entitled to exclusive possession or that the owner intruded *64 upon it: the owner lived in the same building as the occupant; the owner retained a key to the occupant's rooms; the owner was charged with cleaning hallways and windows; the owner had the right to enter the premises and to make repairs; the occupant shared a bath or kitchen with the owner; the premises were furnished; maid service was provided; towels and linens were supplied; light, heat, and water were provided. In cases establishing some or all of the above factors, the occupant has normally been held to be a lodger."
In view of the undisputed evidence demonstrating that Johnson did not have exclusive legal possession of his room, that Mrs. Kolibas, the co-owner, entered the room regularly to make Johnson's bed and for cleaning purposes, and that the premises were licensed as a boarding house, these factors alone are sufficiently persuasive to indicate that plaintiff was a roomer, not a tenant. Cf. Tamamian v. Gabbard, 55 A.2d 513, 514 (D.C. Mun. Ct. App. 1947), where the court held that a person who rented a room in a rooming house operated by defendants was a roomer within the plain meaning of the term where the furniture, furnishings, linens and towels, as well as maid service, were either owned or supplied by defendants.
Defendants next argue they violated no duty they may have owed Johnson. A lodging house or rooming house keeper, like the owner or operator of a hotel, is not an insurer of the safety of his guests. He is, however, required to exercise ordinary care to render the premises reasonably safe for their use. Wright v. United States, 95 F. Supp. 943, 952, 118 Ct. Cl. 576 (Ct. Cl. 1951); Ford v. Burden, 276 P.2d 925 (Okla. Sup. Ct. 1954) (interpreting a statutory provision); cf. Ball v. Atlantic City Ambassador Hotel Corp., 137 N.J.L. 744, 746 (E. & A. 1948); and see 43 C.J.S., Innkeepers, § 22(a), pp. 1173 and 1176 (1945); 29 Am. Jur., Innkeepers, §§ 56-57, pp. 44-45 (1960).
Courts have in the past drawn a distinction between a hotel or inn and a boarding house or lodging house, and on occasion have even subdivided these categories. Such distinctions may have validity in other settings, but we find *65 no reason to confine to the strait jacket of narrow classification the rationale which should apply in the present circumstances.
The basic philosophy underlying the law of negligence is whether the defendant breached some duty he owed to the individual complaining, the observance of which would have averted or avoided the injury. "Duty," as was said in Wytupeck v. Camden, 25 N.J. 450 (1957), is not an abstract conception. The standard of conduct is not an absolute:
"* * * Duty arises out of a relation between the particular parties that in right reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable, Lokar v. Church of the Sacred Heart, 24 N.J. 549 (1957). In the field of negligence, duty signifies conformance `to the legal standard of reasonable conduct in the light of the apparent risk'; the essential question is whether `the plaintiff's interests are entitled to legal protection against the defendant's conduct.' Prosser on Torts (2d ed.), Section 36. Duty is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct." (at pages 461-462)
There should be no distinction drawn, in circumstances such as are here present, between the duty owed by a defendant to a plaintiff, whether the latter be a business invitee in the broad sense of the word (the trial court so considered plaintiff in this case), the guest of a motel, hotel, or inn, or a lodger. The duty of reasonable care in such circumstances is owed to any of these persons.
Defendants, as owners and operators of a lodging house, owed plaintiff and the other lodgers the duty of maintaining their premises in a reasonably safe condition. This duty logically encompassed the obligation to warn plaintiff when defendants became aware that the premises were no longer safe because of the presence of fire. It does not matter that the fire in this case was accidentally started through the carelessness of another lodger, and not *66 because of defendants' fault. Once they learned of the fire, their duty was to exercise reasonable care in the circumstances for the safety of their roomers by warning them of the presence of the fire. Wright v. United States, supra, 95 F. Supp., at p. 953; Hercules Powder Co. v. Crawford, 163 F.2d 968, 970 (8 Cir. 1947); cf. Smith v. The Texan, Inc., 180 S.W.2d 1010 (Tex. Civ. App. 1944) (hotel); 43 C.J.S. Innkeepers § 22(c), pp. 1185-6 (1945), and 29 Am. Jur., Innkeepers, § 64, pp. 52-54 (1960); see Annotation: Innkeeper  Liability to guest, 18 A.L.R.2d 973, 4 (1951).
Plaintiff, faced with an emergency when he opened the door of his bedroom and found the hall filled with smoke and flame, was forced back into his room and chose the only other exit, the window. His act in seeking to escape through the window by hanging from the ledge and letting himself drop to the ground below, can be considered an instinctive choice of hazards. This choice represented the exercise of the roomer's best judgment, and cannot be deemed contributory negligence, even if it later appeared that he erred in his choice. The injuries sustained in that fall, therefore, can be the basis of a verdict against the owner of a lodging house. Bernucci v. Marfre Holding Corp., 171 Misc. 997, 14 N.Y.S.2d 304 (Sup. Ct. 1939). The immediate basis of liability in Bernucci was the violation of a statutory duty owed to the roomer, not, as in the present case, of a common law duty. Nevertheless, the decision is still apposite.
The evidence adduced presented conflicting testimony on the key issue of whether John Kolibas warned plaintiff of the fire. Kolibas testified that he saw Johnson in the hall shortly after he and his wife were awakened by the smoke, and that he told Johnson to run. Under the circumstances of this case, that would have satisfied his duty to warn his roomer of the danger.
It is apparent, however, that the jurors believed Johnson's version of the events that occurred during the *67 fire  that defendants had failed to warn him. The conflicting testimony was of such a nature that men of reason and fairness could entertain divergent views as to the truth of the testimony. Consequently, it was proper to submit to the jury the issue of whether defendants had violated their duty. Ferdinand v. Agricultural Ins. Co., 22 N.J. 482, 494, 62 A.L.R.2d 1179 (1956); Panko v. Grimes, 40 N.J. Super. 588, 594 (App. Div. 1956).
On the issue of whether defendants had reasonable opportunity in which to warn Johnson of the imperative danger, suffice it to say that defendants' apartment was adjacent to plaintiff's room, and John Kolibas himself admitted he had time to get partially dressed and take the tavern receipts before he and his wife left the second floor. Under these circumstances, it was for the jury to determine whether the defendants had ample time in which to alert Johnson to the danger of fire. The jury could have found from this portion of his testimony that defendants did have reasonable time, once they were aware of the fire, in which to fulfill their duty to warn Johnson. Cf. Hercules Powder Co. v. Crawford, supra.
Defendants also argue that the failure to warn was not the proximate cause of plaintiff's injuries. The jury had a reasonable basis on which to postulate that defendants' failure to warn was the proximate cause of plaintiff's injuries. The import of Johnson's testimony was that the fire prevented him from making any choice of escape except through his window. It was foreseeable under the facts that a fire on the second floor could block his escape through the hall. Defendants' failure to carry out their obligation to warn Johnson so that he could safely leave the building by way of the hall, necessarily, therefore, raised a jury question whether such failure did proximately contribute to the foreseeable injury. Generally, questions of proximate cause are left to the jury for its factual determination. Rappaport v. Nichols, 31 N.J. 188, 203, 75 A.L.R.2d 821 (1959). Cf. Bernucci v. Marfre Holding Corp., supra.
*68 Lastly, defendants' motions for dismissal at the end of plaintiff's testimony and at the conclusion of all the testimony were based upon the ground that plaintiff had failed to establish a prima facie case and that the proofs did not substantiate the issue of warning. The motion for a new trial was predicated upon the verdict's being against the weight of the evidence, excessive and the result of passion, prejudice, mistake and partiality. Franklin Discount Co. v. Ford, 27 N.J. 473, 490 (1958); Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1955). In view of our foregoing conclusions, we find no basis on which the judge could have granted the motions.
Judgment affirmed.