JEROME J. HAKE, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF ROBERT HAKE, DECEASED, AND GENERAL ADMINISTRATOR OF THE ESTATE OF ROBERT HAKE, DECEASED; JEROME J. HAKE, INDIVIDUALLY, AND MARGARET HAKE, PLAINTIFFS-APPELLANTS, v. MANCHESTER TOWNSHIP, HAROLD PAYNE, ERNEST JAMES AND JOHN DOE, DEFENDANTS-RESPONDENTS.

Argued September 24, 1984—Decided January 22, 1985.

*Jerome J. Hake* argued the cause *pro se.*

*Thomas F. Kelaher* argued the cause for respondents (*Gelzer, Kelaher, Shea & Novy,* attorneys; *Robert C. Shea* on the brief).

The opinion of the Court was delivered by

O'HERN, Justice.

This is a wrongful death action brought by plaintiff-parents against Manchester Township, its Chief of Police, a duty sergeant, and an unknown police officer. Plaintiffs sought damages for negligent conduct that they alleged contributed to cause the suicide-death of their seventeen-year-old son at police headquarters. Margaret Hake died while this appeal was pending.[1]

Plaintiffs advanced two factual theories in support of their cause of action: (1) that the negligent supervision of their son while in defendants' custody contributed to cause the act of

---

[1]We shall continue to refer to both parents as plaintiffs in this opinion. When we refer to Mr. Hake, we mean Jerome Hake, the father of Robert Hake. When we refer to the municipality, we mean all the defendants.

suicide; and (2) that the defendants' failure to render prompt emergency care to the victim when discovered deprived him of a chance to be revived. The first issue was presented to a jury at trial and resolved in favor of the defendants. The second issue was never presented to the jury because of evidentiary rulings at the trial.

Plaintiffs appealed on both aspects. The Appellate Division affirmed the judgment below in an unreported opinion. We granted plaintiffs' petition for certification. 96 *N.J.* 297 (1984). We now affirm in part and reverse in part. We leave undisturbed the jury verdict in favor of the municipality on the issue of negligent supervision of the youth. We reverse on the second issue and remand for further proceedings the claim of failure to provide prompt emergency rescue efforts.

The pivotal evidentiary ruling concerned the degree of competence required of a proffered expert witness whose testimony was intended to prove that lifesaving techniques might have saved the victim's life. This witness, Warren Mason, was the dispatcher on duty at the time of the accident. The court ruled inadmissible the offer of his testimony, although he was a trained first-aider, because the witness assertedly lacked the requisite knowledge to offer the opinion as to the cause of death. As a result of this threshold ruling other evidence relating to the duty of police officers to render prompt emergency assistance to apparent suicide victims in their custody was precluded. The duty of care plaintiffs were prepared to establish was that the proper emergency medical procedures applicable to police are that "persons are considered unconscious by police officers until pronounced dead by competent authority," and attempts at revival should be made until death is determined. The trial court held the proof of duty inadmissible in the absence of "medical testimony" that the lifesaving measures would probably have saved the victim's life. The exchange was:

THE COURT: So my ruling is that I will need medical testimony to establish the probability that it would have made a difference.

MR. MONAHAN [plaintiffs' attorney]: Meaning more probable than not?

THE COURT: Well, I mean that you are going to be able to call a medical person to testify, one, that when this man came into the room on the last time and saw the young man, that he was probably still alive and that, two, that if the procedures had been followed to a degree of reasonable medical probability, the young man would have been saved. It's no different than any other negligence case, Mr. Monahan.

■■ We now hold that a reliable expert opinion on the lifesaving potential of emergency first aid services can be given by a witness whose competence as an expert in this field is demonstrated by education, training or experience, and that a professional license or degree in medicine is not a prerequisite to establish sufficient knowledge to qualify as an expert. Accordingly, plaintiffs should be permitted to demonstrate that their witness has the requisite specialized knowledge, training or experience to qualify as an expert. We hold further that in establishing causation it suffices for plaintiffs to show that defendants' negligent conduct negated a substantial possibility that prompt rescue efforts would have been successful, thereby constituting a substantial factor in causing decedent's death.

## I.

The tragic incident grew out of a motor vehicle arrest of Robert Hake on Friday, December 23, 1977. At that time, Robert was seventeen years of age. Two officers of the Manchester Township Police Department, on routine patrol in the early afternoon, received a report to be on the lookout for a suspicious vehicle in their area. They soon spotted Robert driving a car fitting the description. (It was his father's car.) Following a pursuit, the police officers apprehended Robert and immediately suspected him of being under the influence of alcohol. The arresting officers transported Robert to the Manchester Township Police Department and, commencing at about 2:45 p.m., tested him for the presence of alcohol. A second reading of the breathalyzer was at about 3:18 p.m. The blood alcohol readings were .12%. After reviewing the results of the breathalyzer tests, one of the officers issued Robert a traffic

summons for driving while intoxicated, a violation of *N.J.S.A.* 39:4–50. Robert was fingerprinted at approximately 3:35 p.m. Following this, Robert was put into the "detention area" at the police headquarters. Detective Walizer, one of the arresting officers, called Robert's father at about 3:45 p.m. and told him that Robert had been placed under arrest but would be released into his father's custody if he came to pick him up. The police were also investigating potential criminal charges against Robert on account of the reported theft of a truck earlier in the day, and told Robert that he would have to come back at 10:00 a.m. on Monday to face possible criminal charges.

The trial focused closely upon the contents of the conversation between Detective Walizer and Mr. Hake. The municipal officials contended that had they known Robert had previously been in trouble with the law, they would have exercised greater care for his supervision. The plaintiffs insisted that they were satisfied that Robert was fully rehabilitated and that his juvenile record was of no consequence. In any event, following this conversation, Robert remained at the police headquarters. Mr. Hake lived in Mt. Laurel, about an hour away, and was unavoidably detained in his efforts to obtain transportation to Manchester.

The police officials maintained that Robert was not a prisoner and that therefore they did not remove Robert's belt. According to defendants, Robert was not in a cell, but was merely in a room that served as a multi-purpose room for various squad activities, such as fingerprinting and breathalyzer testing, as well as detention. The detention area is a small holding area described as about "six feet wide and about twelve feet long." The room containing the detention area has two cells and two outer doors, one that leads to the hallway and one that is directly opposite the radio room. The room was equipped with an intercom that was inoperative on the date in question. The hallway door was invariably locked. The door to the radio room was open but capable of being locked.

At about 4:10 p.m., Detective Walizer left the stationhouse, but before doing so, he left instructions for the incoming Duty Sergeant, Ernest James, concerning the arrangements made to pick up Mr. Hake's car. At approximately 4:30 p.m., the on-duty dispatcher, Warren Mason, noticed that the door to the detention area opposite the radio room was shut. Once shut, the door locked automatically and could be opened only from the outside. Mason had last gone in to speak to Robert at about 4:15 p.m. There is no testimony that anyone saw Robert close the door. Mason testified that he looked in on Robert once more after the doors were closed at about 4:35 p.m. On cross-examination, Mason put the time at "close to 5."

Walizer testified that although Robert had appeared depressed when he first came in, he appeared to cheer up as the afternoon wore on. Walizer described Robert as being interested in knowing whether he would be able to get the Christmas presents that he had in the car. At about 4:45 p.m., dispatcher Mason called Sergeant James to clarify the arrangements in the tow log regarding the pickup of the family car. Sergeant James returned from patrol to the stationhouse. He passed the detention area about 5:00 p.m. but did not look inside. He began asking Mason some questions about Robert, but decided to speak to Robert directly. At about 5:05 p.m., Sergeant James went to the detention area and saw Robert slumped down in a seated position on the floor, unconscious in a corner with a belt around his neck. The Sergeant opened the door.

He found that Robert's belt had been secured to the middle bar of one of the cell doors, exerting pressure on his throat. After checking for Robert's pulse and finding none, Sergeant James went back into the radio room and advised the dispatcher to log the time at 5:07 p.m. He then ran downstairs to get his supervisor, Lieutenant Ruerup, whose office was at the bottom of the stairway. The dispatcher, Mason, ran into the detention area. By the time Mason finished feeling for Robert's neck pulse, the Sergeant had returned with Ruerup and Harold Payne, the Chief of Police. Mason testified that he turned to

the Chief and asked him if he would like him to call the First Aid Squad to have them stand by. The Chief responded that he wanted the Ocean County Sheriff's Office and the prosecutor's office contacted and their photo unit to respond. Mason testified that Sergeant James asked the Chief if he could cut Robert down and that the Chief said no, he wanted him left where he was.

Plaintiffs sought to prove that in these circumstances, the police officers were under a duty to render prompt emergency aid to the victim. Jayne Rich, plaintiffs' expert witness on the standards of police practice, was prepared to testify that the proper procedure would have been to cut the prisoner down immediately, call an ambulance, and administer cardiopulmonary resuscitation (CPR) until the ambulance arrived. Plaintiffs sought to prove that this breach of the duty of care in failing to follow these procedures and adhere to these standards contributed to Robert's death. The trial court, however, ruled her testimony inadmissible, not because of her lack of expertise, but because there was no competent proof that the asserted breach of duty causally contributed to Robert's losing his last chance of survival.

The decisive issue was causation. Although our decision turns upon the admissibility of the evidence of dispatcher Mason, that ruling cannot be considered in the abstract. We must consider it in light of the substantive principles of causation at issue. Courts have struggled to discover workable principles to resolve claims of a lost chance. *Cf. Dillon v. Twin State Gas & Elec. Co.*, 85 *N.H.* 449, 163 *A.* 111 (1932) (youth, falling from bridge after loss of balance, came into contact with high tension wire). Tort claims based on "lost chance" in terms of the causation of ultimate injury present unique conceptual and analytical problems not presented in other more typical negligence cases.

We recently considered an aspect of this issue in *Evers v. Dollinger*, 95 *N.J.* 399 (1984). That case dealt in part with the

loss of a chance to recover from cancer, which loss of chance was alleged to be due to the physician's failure to diagnose the condition promptly. The question posed was whether the subsequent spread of the cancer would have occurred anyway, in which event the traditional "but for" test of causation would insulate the negligent actor from liability. In that narrow context of misdiagnosis of cancer, we held that the physician could be held liable if it were shown "within a reasonable degree of medical probability" that the delay in diagnosis and care "increased the risk" of harm to the patient "and that such increased risk was a substantial factor in producing" the resultant injury. *Id.* at 417. In that case we cited a passage frequently quoted:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he had put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly. [*Id.* (citing *Hicks v. United States*, 368 *F.*2d 626, 632 (4th Cir.1966))(emphasis in original) (diabetic patient at military hospital may recover based on allegation that undiagnosed intestinal obstruction contributed to causing death even though if surgery had been performed immediately, it is merely speculative whether it would have been successful in resolving the infection).]

These cases draw upon the example of the drowning seaman. Courts have recognized that the master of a ship can be held liable for the death of a seaman if rescue efforts are not made. In this setting it is rarely possible to show that the seaman would have been found had the master taken the vessel off course to search for the victim or even taken the effort to throw a life ring to the drowning seaman. Nevertheless, recovery has been permitted.

Proximate cause is tested by the same standard, i.e., causation is proved if the master's omission destroys the reasonable possibility of rescue. * * * Therefore, proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample

or narrow, according to the circumstances, total disregard of the duty, refusal to make even a try, as was the case here, imposes liability. [*Gardner v. National Bulk Carriers, Inc.*, 310 *F.*2d 284, 287 (4th Cir.1962), *cert.* den., 372 *U.S.* 913, 83 *S.Ct.* 728, 9 *L.Ed.*2d 721 (1963).]

*See also* 2 F. Harper & F. James, *The Law of Torts*, § 20.2 at 1113 (1956) (in cases of failure to afford rescue assistance, "courts have generally let a jury find the failure caused the harm, though it is often a pretty speculative matter whether the precaution would in fact have saved the victim").[2]

Our concepts of causation for failure to act are generally expressed in terms of whether the conduct may be viewed as a "substantial factor contributing to the loss." *Francis v. United Jersey Bank*, 87 *N.J.* 15, 44 (1981); *see Brown v. United States Stove Co.*, 98 *N.J.* 155, 399 (1984); *Evers v. Dollinger, supra*, 95 *N.J.* at 417. To make out a claim in this narrow class of cases of lost chance of survival, plaintiffs here need establish only that defendants had a duty to try to save Robert's life and that there was a substantial possibility of the rescue of their son from death. The municipality did not contest that it had a duty to try to save the life of an attempted suicide-victim under the circumstances. It objected to the evidence of Jayne Rich, the plaintiffs' expert on duty, not because it disagreed with her description of defendants' duty, but because of the potential prejudicial effect of her testimony if plaintiffs were not able to show that the municipality's failure to cut Robert down and render first aid would have saved his life.

Plaintiffs sought to establish the possibility of rescue by showing that an apparently lifeless person without a pulse can sometimes be revived through the use of cardiopulmonary resuscitation. Where a case involves nonfeasance, no one can say "with absolute certainty what would have occurred if the

---

[2]The concept is analogous to the rule in workers' compensation death cases that courts "generally are satisfied with very scanty circumstantial evidence" that the death was related to employment. *Macko v. Herbert Hinchman & Son*, 24 *N.J.Super.* 304, 307 (App.Div.1953).

defendant had acted otherwise." *Francis v. United Jersey Bank, supra,* 87 *N.J.* at 45 (citing W. Prosser, *Law of Torts* § 41 at 242 (4th ed. 1971)). The consequences of failure to make the effort are that it "obliterate[s] all possibility of evidence to prove whether a [rescue], if undertaken, would have succeeded or failed." *Gardner v. National Bulk Carriers, Inc., supra,* 310 *F.*2d at 287. All that can be done at this point is to try to resolve whether there was a substantial possibility of rescue.

The facts of the case are not conclusive as to how long Robert may have been hanging when Sergeant James discovered him. We do know that dispatcher Mason testified on direct that he last looked in on Robert at 4:35 p.m., and his testimony on cross was that it was "close to 5." Sergeant James walked past the detention area at 5:00 p.m. but "did not look in." It is thus possible that Robert was alive as late as 5:00 p.m. or shortly before his discovery at 5:05 p.m. There was no medical examiner's opinion in evidence as to the time of death. The death certificate apparently put the time of death at the time that the physicians arrived to pronounce the victim's death. Within this time framework, plaintiffs would have to show that there is a substantial possibility of saving the life of an apparently dead strangulation victim through the prompt admission of cardiopulmonary resuscitation.[3]

A hanging victim ordinarily dies from asphyxia or loss of oxygen to the brain resulting from the strangulation. The process of dying spans an undefinable amount of time, but there are two factors that weigh heavily in the determination. These factors are "the severity of the constricting force and the point of application of that force." J. Glaister & E. Rentone,

---

[3]In other circumstances courts have found a presumption that life continues "until evidence is presented sufficient to establish that death occurred at some specific time." *Fontenot v. Southern Farm Bureau Casualty Ins. Co.,* 304 *So.*2d 690, 693 (La.Ct.App.1974) (citations omitted); *Fretz v. Anderson,* 5 *Utah* 2d 290, 300, 300 *P.*2d 642, 649 (1956).

"Hanging," *Medical Jurisprudence and Toxicology,* p. 166 (12th ed. 1966). The effect of these two factors produces variables of as much as several minutes in the time necessary for death to occur. *Id.* at 166–67. In general, however, when death occurs from asphyxia,

> the heart continues to beat for a few minutes after the cessation of respiration, and, therefore, artificial respiration on a suspended person may prove successful if the body is cut down within five or six minutes after the commencement of suspension. [*Id.* at 167.]

Plaintiffs sought to offer the evidence of dispatcher Mason to prove that there was a possibility of rescue.[4] Mason was trained in lifesaving techniques of first aid. He had been trained and certified to administer first aid at the time of this occurrence. At the time of trial, he had an approved certificate in CPR. The record, however, does include an evaluation of his background and competence to establish the lifesaving possibility of the emergency rescue procedures.

In the analogous context of proving a standard of care, excepting malpractice cases, there is no general rule or policy requiring expert testimony. 2 F. Harper & F. James, *supra,* § 17.1 at 966. Under Evidence Rule 56(2) a witness qualified as an expert by "knowledge, skill, experience, training or education may testify in the form of opinion" as to matters requiring specialized knowledge if such testimony will assist the trier of fact. *Cf. State v. Kelly,* 97 *N.J.* 178 (1984) (battered-woman's syndrome is an appropriate subject for expert testimony); *State v. Davis,* 96 *N.J.* 611 (1984) (potential for rehabilitation can be established by expert in statistical analysis). The test of the need for expert testimony is whether the matter is "so esoteric

---

[4]Plaintiffs suggest that the trial court should have called the medical examiner to testify, as the autopsy surgeon testified in *Lucas v. City of Long Beach,* 60 *Cal.App.*3d 341, 131 *Cal.Rptr.* 470 (Ct.App.1976), that the victim could have survived as much as fifteen minutes while hanging in the noose. The issue of the trial court having an obligation to call an expert witness on its own under *Polulich v. J.G. Schmidt Tool, Die & Stamping Co.,* 46 *N.J.Super.* 135 (Law Div.1957), was not raised below.

that jurors of common judgment and experience cannot form a valid judgment" as to the fact in issue. *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 283 (1982) (expert testimony not required to establish that store had provided inadequate security for patrons). What we look for from the witness is "the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion." *Sanzari v. Rosenfeld*, 34 *N.J.* 128, 136 (1961) (physician may testify with respect to dentist's duty of care).

█  Every qualified first-aider is expected to meet minimum standards of training, competence, and experience in dealing with emergency rescue techniques. American Red Cross, *Advanced First Aid and Emergency Care*, pp. 17–23, 65–83 (1982). Without knowing more, we cannot say that Mason did not possess sufficient technical training and knowledge to express a reliable opinion on the life-saving potential of CPR. While the subject is ultimately medical in nature, all aspects of the subject are not within the exclusive knowledge of licensed practitioners. Mason may have been able to testify from personal experience that apparently lifeless persons without pulse or color had been revived. Cardiopulmonary resuscitation has, over the last thirty years, become one of the major techniques used in saving lives. It allows persons who would normally be committed to death to have a second chance at life. *See* C. Beck, E. Weckesser and F. Barry, "Fatal Heart Attack and Successful Defibrillation," 161 *J.A.M.A.* 434 (1956). CPR involves measures developed to provide effective ventilation and circulation when a person's respiration and heart have ceased functioning. Although the literature refers to cardiac arrest, respiratory failure is comparatively similar.

The procedure for basic CPR is simple. It merely involves opening the victim's airway, restoring the victim's breathing, and reinstituting the victim's circulation by exerting intermittent pressures on the chest area. *See* National Conference on Standards for Cardiopulmonary Resuscitation and Emergency

Cardiac Care, "Standards for Cardiopulmonary Resuscitation (CPR) and Emergency Cardiac Care (ECC)," 244 *J.A.M.A.* 453, 461 (1980). These steps can be performed under almost any circumstances and without adjunctive equipment or help from another person. *Id.*

Indeed, the availability and widespread use of artificial maintenance of cardio-respiratory functions has necessitated a redefinition of death. In the medical profession there is a growing trend to define death as an irreversible loss of brain function. *See In re Conroy*, 98 *N.J.* 321, 359 n. 4 (1984); *People v. Eulo*, 63 *N.Y.*2d 341, 349, 482 *N.Y.S.*2d 436, 472 *N.E.*2d 286 (1984); *see also In re Welfare of Bowman*, 94 *Wash.*2d 407, 412, 617 *P.*2d 731, 734 (1980) ("heart and lungs" definition of death only part of definition of death); Abram, "The Need for Uniform Law on the Determination of Death," 27 *N.Y.L.Sch.L.Rev.* 1187, 1189 (1982). All body tissues require oxygen, but the brain requires more than any other tissue. American Red Cross, *Cardiopulmonary Resuscitation* (1981). The probability of brain damage after oxygen flow to the brain has ceased depends upon the speed of application of CPR. Although a festering debate continues within the medical profession as to the specific criteria to be utilized to determine brain death, brain death has become the accepted medical standard. Abram, *supra*, 27 *N.Y.L.Sch.L.Rev.* at 1191–1192.

In a case such as this, the general acceptance by the medical community of the usefulness of cardiopulmonary resuscitation, the widespread dissemination of the value of these lifesaving measures to the general public,[5] and the specialized training of volunteer first-aiders in this work sustain the belief that the possibility of saving the life of a strangulation victim is not so

---

[5]Information about the possibility of saving the life of one thought to be dead through CPR is widely disseminated. *See* National Conference on Standards for Cardiopulmonary Resuscitation and Emergency Cardiac Care, *supra*, 244 *J.A.M.A.* at 453; 227 *J.A.M.A.* 837, 840 (1974).

esoteric that jurors cannot form a reasonable opinion about it without the testimony of a physician. "Of course in many situations plaintiff would be well advised both to bolster his case and avoid questions, by calling experts." 2 F. Harper & F. James, *supra*, § 17.1 at 967 n. 9; *see Ray v. Ameri-Care Hosp.*, 400 *So.*2d 1127 (La.Ct.App.1981) (jury verdict in favor of hospital sustained on basis of doctor's testimony that efforts to revive hospital patient would have been futile). Plaintiffs would undoubtedly be able to bolster their case with the testimony of a physician. But it remains that plaintiffs should have the opportunity to present their claim to the jury through the use of witnesses other than a physician having the minimal technical training and knowledge essential to the expression of a reliable opinion.[6] On remand, plaintiffs may seek to qualify Mason as such a witness.

## II.

We have carefully considered the other points raised by plaintiffs on appeal. We are satisfied that they were correctly resolved below. The trial court was not obliged to charge that a violation of *N.J.S.A.* 2A:4A–37(c) (requiring segregation of juvenile detainees from those in adult facilities) was to be considered as evidence of negligence in view of the

---

[6]The defendants also asserted that the testimony of Mason was barred for plaintiffs' failure to name Mason as an expert in answers to interrogatories. There was no surprise about his testimony since it had been covered in his pretrial deposition. The record does not establish that the trial court based its ruling upon this discovery aspect. Defendants' brief before us candidly recognized that the trial court indicated that it would allow Mr. Mason to give his opinion as to the impact of the resuscitation procedures "if a medical person could state that (1) Robert Hake probably was still alive; and (2) if the procedures had been followed to a degree of reasonable and medical probability, the young man would have been saved," and that the plaintiffs were therefore given the opportunity to recall Mason upon establishing the appropriate medical foundation. To clarify this issue plaintiffs should supplement their answers to interrogatories before retrial on such terms as the trial court may direct. *R.* 4:17–7.

disputed factual question that Robert was technically not being detained .as a juvenile. Nor was there an affirmative duty created under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1-1 to 59:12-3, that defendants failed to fulfill by not providing first aid. Immunity is the dominant consideration of the act. *See N.J.S.A.* 59:2-1 comment.

■ Plaintiffs rely on *Estelle v. Gamble*, 429 *U.S.* 97, 97 *S.Ct.* 285, 50 *L.Ed.*2d 251 (1976), to establish that Robert was deprived of a constitutional right to treatment under the Eighth Amendment in violation of 42 *U.S.C.* § 1983. But in *Estelle* the District Court dismissed the complaint for failure to state a claim upon which relief could be granted. Therefore, the allegations in the complaint would have had to be accepted as true. So viewed, the complaint in *Estelle* would have established that deliberate indifference to serious medical needs of prisoners that constitutes the unnecessary wanton infliction of pain proscribed by the Eighth Amendment that states a cause of action under 42 *U.S.C.* § 1983. That much is conceded. In contrast, the question here is one of fact. The trial court found, in the record, no intentional or wanton indifference to Robert's needs. The circumstances were undoubtedly so startling and unexpected as to test anyone's ability to react. At most, the evidence sustains that the defendants may have erred in judgment. The trial court found insufficient evidence to present a claim of punitive damages to the jury. That issue should not be reopened.

■ Plaintiffs also assert that they were prejudiced by failure to record all of the side bar and chambers conferences that took place during the course of the trial, in violation of Rule 1:2-2. We have carefully reviewed the transcript of the motion to settle the record on appeal. We are satisfied that the court reviewed the entire transcript of the trial to determine that every important substantive discussion, with respect to either questions of law or questions of admissibility of evidence, was at side bar and was on the record, and that the substantive

results of chambers conferences were made part of the record. Moreover, we find no rulings related to such chambers conferences that we can determine would have materially influenced the jury's deliberations.

■ The plaintiffs raise as plain error that the charge to the jury induced it to exonerate the municipality by suggesting that if it found Robert's voluntary act of suicide to be the immediate cause of death, the municipality would not be liable. The dispute here concerned whether special circumstances of care existed because of Robert's condition (whether caused by the influence of alcohol or the depression induced by his arrest so close to the holidays), and whether his suicide was foreseeable. "Special circumstances" form the basis of most decisions involving a jailer's liability for a prisoner's acts of self-destruction. *Pretty On Top v. City of Hardin,* 182 *Mont.* 311, 597 *P.* 2d 58 (1979); *Lucas v. City of Long Beach, supra,* 60 *Cal.App.* 3d 341, 131 *Cal.Rptr.* 470. And the question of whether or not the injury was one that could have been reasonably anticipated is a question of fact for the jury. *Falkenstein v. City of Bismarck,* 268 *N.W.*2d 787 (N.D.1978); *see* "Civil Liability for Causing or Failing to Prevent Suicide," 12 *Loy.L.A.L.Rev.* 967, 994 (1979).

The jury considered each of these issues. The charge expressly permitted the jury to find liability if the suicide was foreseeable:

[T]he defendants are not relieved from liability if you find the intervening voluntary act of the decedent taking his own life was reasonably foreseeable by the defendants. The defendants' negligence then would remain an efficient cause of his death and therefore plaintiff would recover damages for that death.

Nor do we believe that any error concerning the disputed factual issues surrounding the alcohol burn-off rate and the toxicological report of alcohol levels at the time of death would constitute such plain error that to sustain the verdict would be manifestly unjust. *See Hudgins v. Serrano,* 186 *N.J.Super.* 465, 477 (App.Div.1982). The municipality argued that the

showing of 0.08% blood alcohol at the time of death established that Robert was not intoxicated at that time and thus no "special circumstances" existed. Plaintiffs contend that this percentage contradicts the proofs as to the time of death. Finally, we sustain the trial court's disposition of the claims of emotional injuries suffered by the surviving family members and its ruling that Detective Walizer could not be substituted as a "John Doe" defendant two years after the cause of action accrued. We have carefully considered the other points raised in the plaintiffs' brief and do not find cause to disturb the verdict below.

The judgment of the Appellate Division is affirmed in part and reversed in part. The cause is remanded to the Law Division for further proceedings in accordance with this opinion.

*For affirmance in part; reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.