**Violet Irene NEBEL, as Executrix of the Estate of John J. Nebel, Deceased, and Violet Irene Nebel, in her own capacity, Plaintiffs,**

v.

**AVICHAL ENTERPRISES, INC. t/d/b/a Airport Motor Inn and 500 N. Albany, Inc., Defendants.**

Civ. A. No. 86–3293.

United States District Court, D. New Jersey.

Jan. 19, 1989.

Blank, Rome, Comisky & McCauley, P.C. by Stephen M. Orlofsky, Victoria J. Airgood, Cherry Hill, N.J., for plaintiffs.

LaBrum and Doak, P.C. by William F. Keating, Steven J. Blumenthal, Woodbury, N.J. and Capehart & Scatchard, P.A. by Thomas H. Morgan, Moorestown, N.J. for defendants.

## OPINION

COHEN, Senior District Judge:

Before us, in this personal injury action with "negligent security" [1] and "failure to

---

**1.** One commentator has used an analysis of negligent security litigation to advance his thesis that in certain classes of cases where courts have traditionally applied "no duty" rules for process reasons (the inadequacy of judiciary, as it presently exists, to handle a potential "floodgate" of litigation), the invocation of a liability rule could spur potentially desirable political effects (the enactment of legislation) which simultaneously slam shut the judicial Pandora's Box and solve critical social problems (such as crime). Zacharias, *The Politics of Torts*, 95 Yale L.J. 698 (1986). In the course of his exposition, the author offers the following overview:

> The term "negligent security" refers to cases in which the injured crime victims sue commercial enterprises upon or near whose property the crimes occurred. The victims allege that the enterprises should have taken advance measures—such as improving lighting, hiring guards, or at least issue warnings—that might have prevented the harm. Until recently, courts precluded negligent security liability based on a general notion that private parties have no duty to protect unrelated persons

rescue"[2] overtones, is a motion by the plaintiffs (Violet Irene Nebel, as Executrix of the Estate of John J. Nebel, Deceased, and in her own capacity) for a new trial pursuant to Fed.R.Civ.P. 59 on the issues of proximate cause, compensatory damages and punitive damages.

## I. BACKGROUND

This matter arises out of a most unfortunate incident which occurred the morning of June 19, 1985 at the Airport Motor Inn ("Inn") in the Chelsea Heights section of Atlantic City, New Jersey. The defendants, the owners and operators of the Inn, are residents of London, England, and have delegated responsibility for its day to day affairs to a manager hired for this purpose. According to the testimony adduced at trial, John Nebel and his wife, Violet Irene Nebel, were registered guests at the Inn. On the morning of the subject incident, having concluded their stay, the Nebels were preparing to check out. Mrs. Nebel was inside their motel room getting dressed while Mr. Nebel loaded their belongings into their van which was parked immediately outside. At approximately 10:00 that fateful morning, Mr. Nebel observed two black males walking down the street bordering on the Inn's open parking lot, and noted that they were looking and walking his way. Sensing trouble, he immediately secured the van, returned to his motel room and shut the door. Although the door closed, it did not lock, and Mr. Nebel stood with his back up against it, whereupon the two young men, one brandishing a long knife in his hand, the other a gun, pushed the unsecured door open and proceeded to rob the Nebels. During the course of the crime's commission, an altercation ensued resulting in Mr. Nebel being shot in the right thigh. The perpetrators fled and remain at large. While this action

was pending, on March 15, 1987, Mr. Nebel died from causes unrelated to this incident.

Trial commenced before a jury on September 26, 1988. On behalf of the plaintiffs, testimony was presented by Mrs. Nebel, Dr. Robert Shellow (plaintiff's security expert), and the Inn's manager Morene Geno (whom the plaintiffs called as a hostile witness pursuant to Fed.R.Evid. 611 and presented as if on cross-examination). In addition, a deposition of Mr. Nebel conducted in March of 1987 was read to the jury, and the jury viewed the video-taped *de bene esse* depositions of Dr. J.P. Carey, M.D. (who examined Mr. Nebel and diagnosed a condition of severe spinal stenosis) and Dr. David G. Baer, M.D. (who treated Mr. Nebel for severe hypertension from October 1986 through March 1987). Defendants offered only the testimony of their security expert Mr. Joseph L. Chernikoff to highlight the non-existence of proximate cause, which was the chief theory asserted and stressed by the defendants at trial. After seven days of trial, on October 4, 1988, the jury answered Special Interrogatories which found the defendants negligent, but that such negligence was not "a proximate cause of the [subject] incident and the [p]laintiffs' resulting injuries and damages." A Judgment of No Cause for Action was entered by the Court on October 5, 1988.

Plaintiffs base their motion for a new trial on the ground that the jury's finding of no proximate cause was against the weight of the evidence. Specifically, plaintiffs contend that through the testimony of Dr. Shellow, the cross-examination of Morene Geno, and the testimony of Mrs. Nebel, they presented "overwhelming" evidence that the Inn's failure to employ at least some of the myriad security devices and techniques available to them was a "substantial contributing factor" to the commission of the crime against the Nebels and

from criminal attack. A growing number of modern judges have, however, allowed cases to proceed. They have extended standard tort rules to hold libraries, supermarkets, restaurants, schools, laundromats, commuter train stations, and summer camps accountable for crime-related injuries.

*Id.* at 698–699 (citation omitted). Of course, this line of cases also extends to landlords, *see, e.g., Braitman v. Overlook Terrace Corp.,* 68 N.J. 368, 346 A.2d 76 (1975) and innkeepers, *see, e.g., Banks v. Hyatt Corp.,* 722 F.2d 214 (5th Cir. 1984).

**2.** *See* text accompanying footnote 9, *infra.*

the resulting physical injuries and damages suffered by the plaintiffs as a result thereof. *See* Brief in Support of Plaintiffs' Motion for New Trial ("Plaintiffs' Brief") at 4–6. Plaintiffs allege that the Inn was negligent in (a) failing to warn the Nebels of recent daytime robberies in Atlantic City; (b) failing to provide a security patrol on the premises during the daylight hours; (c) failing to provide a properly operating door lock; (d) failing to provide a perimeter barrier or fence between the motel rooms along Filbert Avenue and the street; and (e) failing to provide functional and operational closed circuit surveillance cameras and monitors.

In an attempt to rebut this admitted testimony, defendants offered the opinion of Mr. Chernikoff that the subject incident was an "off the wall" event which none of plaintiffs' proposed security measures or techniques would certainly have prevented.[3] Plaintiffs submit that Mr. Chernikoff's opinion was mere "opinion" and "speculation" unsupported by factual analysis of either the crime committed or the security precautions taken by the Inn.[4] *Id.* at 6. There was testimony by plaintiffs' expert, Dr. Shellow, that during the years 1980 to 1985 Atlantic City had the highest crime rate, per capita, in the United States. Rather a dubious distinction. Plaintiffs suggest that since the jury found Dr. Shellow's postulation that the security practices at the Inn were deficient in light

of the statistical probability of crime as presented at trial to be eminently credible, (the jury found the defendants to be "negligent") there is no compelling palpable or articulable reason why the jury would not find Dr. Shellow's opinion that this failure to provide adequate security was a substantial contributing factor to the occurrence of the subject incident (plaintiffs' nomenclature for proximate cause) to be equally credible. Thus, plaintiffs conclude, "in light of this evidence [and the jury's decision on negligence], the jury's conclusion that there was no proximate cause is against the greater weight of the evidence." *Id.* at 7. We believe that the applicable standards for proximate causation in negligent security and failure to rescue cases have been misconstrued. Under the proper test, however, defendants have proffered no bona fide evidence on the issue of "increased risk of harm," but plaintiffs have provided such evidence, as we shall discuss, *infra.*

We agree that the jury's conclusions are at variance with the evidence presented. However, a more significant problem is presented by this motion for a new trial. Now, at this post-trial phase of the litigation, plaintiffs have for the first time called to our attention a line of tort cases that the New Jersey Supreme Court terms "lost chance of survival" or "rescue" actions.[5] *See, e.g., Hake v. Manchester*

---

**3.** Defendants contend that Dr. Shellow's testimony with respect to proximate cause was at best "equivocal", which "did not help to satisfy plaintiffs' burden of establishing proximate cause." Brief in Opposition to Plaintiffs' Motion for a New Trial ("Defendants' Opposition") at 4. To support this assertion, defendants point to Dr. Shellow's inability at trial to state with *any degree of certainty* that a fence or perimeter barrier would have *"prevented"* the subject incident, as he had in his report of September 15, 1987, preferring instead the more cautious approach of merely suggesting that such a barrier would have *"reduced the risk"* of the crime. *Id.* at 3–4. In further support of this allegation, defendants quote Dr. Shellow's deposition testimony of April 22, 1988 wherein he stated that "… it's very possible that people are … so determined and oblivious to their own safety that they may not be deterred [by a perimeter fence] … nothing is one hundred percent certain in this world. *Id.* at 4.

**4.** At oral argument, plaintiffs branded Mr. Chernikoff's opinion that no degree of additional security precautions would have prevented the subject incident as "dubious" and "net opinion without any expert analysis of the issues." Plaintiffs emphasized that Mr. Chernikoff did not testify about the *risk of crime*, an issue discussed at great length by plaintiffs. Instead, according to the plaintiffs, Mr. Chernikoff discounted the crime statistics presented by depicting the Chelsea Heights area of Atlantic City a "tranquil area in a sea of crime", and focused his testimony on advancing the notion that all the security methods suggested by plaintiffs at trial would not have *prevented the crime that occurred.*

**5.** Dean Prosser prefers to call these suits cases involving the "duty to aid one in peril." *See* text accompanying footnote 9, *infra.*

*Township*, 98 N.J. 302, 311, 486 A.2d 836 (1985). The "lost chance" theory holds acts (or the lack thereof as the case may be) of "nonfeasance" as a basis of liability in certain limited factual situations, in abrogation of the general common law rule that one is under no duty to come to the aid of an imperiled stranger, even where that human being faces imminent mortal danger and the rescuer faces little or no risk in attempting to save life. In such negligent omission cases, New Jersey courts formulate the test for a finding of proximate cause as to whether or not the specific acts of nonfeasance complained of may be viewed as a "substantial factor" contributing to the loss. However, in the specific context of lost chance and negligent security cases, "substantial factor" is articulated in terms of negligence which *increases the risk of harm* to the plaintiff. We believe this to be the correct and accurate depiction of the proximate cause standard to be applied in a hybrid lost chance/negligent security case such as the one at bar, yet the jury was never charged in precisely those terms.

■ In light of this newly discovered law which was unbeknownst to the Court at the time of trial and our belief that the jury's verdict was against the substantial weight of the evidence, a miscarriage of justice has occurred. These grounds present compelling reasons for the grant of a new trial and such a reconsideration is absolutely necessary. Consequently, plaintiffs' motion for a new trial shall therefore be granted.

## II. DISCUSSION

### A. *The Standards Controlling a Motion for a New Trial*

Fed.R.Civ.P. 59(a) provides that new trials may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States". Under prevailing federal law, new trials may be granted if the trial judge "is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350 (4th Cir.1941).

■ A new trial may also be granted even where an entry of judgment notwithstanding the verdict is inappropriate. *Roebuck v. Drexel University*, 852 F.2d 715, 735 (3d Cir.1988). Judgment n.o.v. may be granted only where the evidence was insufficient for the jury to consider. A new trial may be granted when, in the "opinion of the trial court, the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice." *Id.* at 735–36 (citations omitted).

■ A district court's discretion *is* limited in that the court may not replace its opinion for that of the jury. *Id.* at 735 n. 35 (citation omitted). However, the exclusive domain of the jury is not invaded by a careful analysis of what inferences the jury could actually draw from the evidence presented at trial. *Id.* at 736. Where the inferences to be drawn from the testimony as presented border on "mere speculation," a new trial becomes necessary. *Id.*

■ Further, a verdict can be manifestly against the weight of the evidence even where the evidence was such that reasonable people could reach a verdict as the jury did. J. Friedenthal, M. Kane and A. Miller, *Civil Procedure* 555 (West.1985) (citation omitted). Under such circumstances, the trial judge may weigh the evidence and grant a new trial. *Id.* (citing *Bevevino v. Saydjari*, 574 F.2d 676 (2d Cir.1978); *Yeatts, supra*). A motion for a new trial is entrusted to the sound discretion of the trial judge, however, the court may not replace its opinion for that of the jury. *See Roebuck*, 852 F.2d at 735 n. 35 (citing *Lind v. Schenley Industries*, 278 F.2d 79, 90 (3d Cir.1960)).

■ In addition, a new trial may be granted based on an allegation of legal error that is supported by a controlling decision not called to the court's attention

at time of trial which was unknown to the moving party due to mistake, inadvertence or excusable neglect. 6A J. Moore, *Moore's Federal Practice* ¶ 59.08[2] at 59–89 (1987). *See also* 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2805 (1973). As the Ninth Circuit once observed:

> One of the purposes of a motion for a new trial is to call to the court's attention errors that may have been committed during the trial, whether those errors be such as have been discovered since the trial, or were committed in opposition to the moving party's contentions asserted at the trial. In other words, the motion may not only be made on the grant of newly discovered evidence, but upon newly discovered law; in fact, the trial court may, during the term at which the judgment was rendered, on its own motion, set aside its judgment and grant a new trial.

*Sulzbacher v. Continental Casualty Co.*, 88 F.2d 122, 124 (8th Cir.1937). *See also Henderson v. S.C. Loveland Co., Inc.*, 396 F.Supp. 658, 661 (N.D.Fla.1975) ("Newly discovered law may, in particular instances and cases, serve as the basis for the granting of a motion for a new trial.")

### B. *An Innkeeper's Duty*

The common law rule that private individuals had no duty to protect another from criminal attack traces its genesis to the seemingly ancient jurisprudential distinction between misfeasance and nonfeasance, and the traditional disinclination of the courts to construct liability rules involving the latter for fear that no workable standards were attainable. Bazyler, *The Duty to Provide Adequate Protection: Landowners' Liability for Failure to Pro-* *tect Patrons from Criminal Attack*, 21 Ariz.L.Rev. 727, 735 (1979). A policy reason frequently offered in support of this doctrine was that "the courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer harm because of his omission to act." W. Prosser, *Prosser and Keeton on the Law of Torts*, 373 (5th ed. 1984). Out of this seemingly wooden distinction between misfeasance and nonfeasance emerged four discrete lines of cases which developed important exceptions to the general rule to ameliorate its often brutally harsh consequences: (a) affirmative conduct cases (the duty to avoid affirmative acts which make the situation of a person in difficulty or peril any worse) [6]; (b) cases involving the prevention of aid by others (the duty to take reasonable care that he does not prevent others from rendering assistance) [7]; (c) cases imposing an obligation to exercise control over the conduct of third persons (a duty arising from public policy considerations that certain relationships which are protective by nature require a defendant to guard his charge against harm from others) [8]; and (d) cases involving the duty to aid one in peril (the moral and occasionally legal responsibility to come to the aid of another human being who is in danger) [9].

Plaintiffs rely exclusively on opinions falling into this fourth category of nonfeasance cases to support their argument that proximate cause is implicit in the jury's finding that defendants breached their duty of care. As we have discussed *supra*, under New Jersey "rescue" cases, the proper question as to proximate cause is whether the negligent omission complained of increased the risk of harm to the plain-

---

**6.** *See* W. Prosser, *Prosser and Keeton on the Law of Torts* 378–82 (5th ed. 1984) for a general cursory overview of this body of law.

**7.** *See generally, id.* at 382.

**8.** *See generally, id.* at 383–85. It is under this line of cases as specifically applied to the innkeeper/guest relationship that the case *sub judice* falls within. We shall refer to this line of authorities as "negligent security" cases throughout this Opinion. For an excellent history of the changing responsibilities of an innkeeper towards his guest, see Taylor, *Innkeeper, Guest and Outlaw: A Very Old Triangle*, 21 S.Tex.L.J. 355, 356–60 (1981).

**9.** *See generally, id.* at 375–77. Plaintiffs place principal reliance on cases falling into this category of nonfeasance, which are sometimes termed "rescue" cases or "lost chance of survival" cases.

tiff and whether that increased risk was a "substantial factor" in producing the resulting injury. *See* Plaintiffs' Brief at 7 (relying on *Hake v. Manchester Township*,[10] 98 N.J. 302, 486 A.2d 836 (1985), and its conceptual/legal antecedents and progeny).

We believe that it would be intellectually disingenuous to depend solely upon this fourth category of cases to resolve the within motion without recognizing and considering the third category as a conceptually distinct doctrinal body, given the radically different substantive justifications for rescue cases, as distinguished from negligent security cases. *See* Zacharias, *supra* note 1, at 742 n. 242 ("[T]his Article does not consider good samaritan cases as a subset of negligent security litigation").[11] Because the facts of this case present elements of both negligent security and rescue, we rely on both lines of authority to reach our conclusion.[12]

▮▮▮ Under New Jersey law, an innkeeper is not an absolute insurer of the safety of its guests. *Johnson v. Kolibas*, 75 N.J.Super. 56, 64, 182 A.2d 157 (1962). Rather, an owner or operator of an inn is under a duty to exercise ordinary care to render its premises reasonably safe for use of its guests. *Wolfe v. Chateau Renaissance*, 141 N.J.Super. 59, 63, 357 A.2d 282 (1976). "In the final analysis, the issue is whether, under all the circumstances, the innkeeper in [question] provided for its guests reasonable protection against injuries from criminal acts." *Courtney v. Remler*, 566 F.Supp. 1225, 1233 (D.S.C. 1983). However, the degree of care which an innkeeper must exercise for the safety, convenience or comfort of its guests may vary with the grade and quality of the

accommodations offered. *Hassan v. Stafford*, 472 F.2d 88, 95–96 (3d Cir.1973).

## III.  PROXIMATE CAUSE

### A.  *Proximate Cause In A Negligent Security Case*

Federal courts consider New Jersey law to hold that a third person's intervening criminal act does not interrupt the causal chain if the defendant could reasonably foresee the possibility of intervening criminal conduct. *New Jersey Bank, NA v. Bradford Securities Operations, Inc.*, 690 F.2d 339, 347–48 (3d Cir.1982). *See also, Berko v. Freda*, 172 N.J.Super. 436, 438, 412 A.2d 821 (1980) ("The intervening criminal act of a third person does not insulate a defendant if such intervening act is reasonably foreseeable.") Defendants essentially concede that the possibility of an intervening criminal act was eminently foreseeable, but contend that the security measures undertaken by the Inn were "reasonable" in light of the risk presented, or alternatively, that each device or technique suggested by plaintiffs would have been ineffectual in preventing or reducing the risk of the subject crime. Defendants' Opposition at 7.  A closer examination of the nature of proximate cause in the conceptually unique context of negligent security cases reveals that the jury's verdict was clearly against the weight of the evidence.

▮▮▮ In negligent security cases, it is *not* necessary that the particular consequences of the negligent act be foreseen so long as it is foreseeable that *some* injury may ensue.  Instead, "proximate cause may be established by demonstrating that according to the common experience of mankind, the resulting injury was a reasonably foreseeable consequence of the negli-

---

**10.** *Hake* itself involved the imposition of a duty upon a police jailer to promptly administer cardio-pulmonary resuscitation (CPR) to a youth in his prison custody found hanged by his belt in a detention room.  The jurisprudential significance of cases such as *Hake* is the willingness of the courts to embrace exceptions to the general "no-duty to rescue one in peril" rule.

**11.** This commentator further elaborates that whatever the merits of the "no-duty to rescue

one in peril" rule, since negligent security defendants are expected to act *before* any crime occurs, the traditional philosophical justifications for the "no-duty to rescue" rule are relevant to the negligent security case.  Zacharias, *supra* note 1, at 708 n. 61.

**12.** That we might have reached the same ultimate conclusions by applying the logic of rescue cases alone to the case at bar is duly acknowledged by the Court.

gent act." *Chomatopoulos v. Roma De-Notte Social Club*, 212 N.J.Super. 447, 453–54, 515 A.2d 296 (1985) (failure of illegal gambling establishment to provide a private security force which would deter and/or control foreseeable altercations among its patrons was a proximate cause of gambler's injury). New Jersey courts recognize the confusing nature of proximate cause in negligent security cases:

> The much cited decision of *Kline v. 1500 Massachusetts Ave. Apt. Corp.*[13] ... observed that the *Goldberg* court[14] seemed to use the word foreseeable interchangeably with possible, and agreed that it would be folly to impose liability for mere possibilities. But we must reach the question of liability for attacks in the sense that they are probable and predictable. Certainly, then, we do not intend an absolute obligation to prevent all crime.

*Butler v. Acme Markets, Inc.*, 89 N.J. 270, 279, 445 A.2d 1141 (1982) (customer injured in store parking lot by criminal act of attacker).

The test for proximate cause then cannot be, as defendants would have us believe, that certain security precautions would not have prevented the crime. Indeed in the landlord-tenant context

> [a] residential tenant can recover damages from his landlord upon proper proof

**13.** 439 F.2d 477 (D.C.Cir.1970). This seminal case arguably launched the modern "negligent security" theory of tort recovery by holding that landlords have a duty to take steps which minimize predictable risks such as criminal assaults and robberies by third persons to their tenants. *Id.* at 481.

**14.** This reference is to *Goldberg v. City Auth. of Newark*, 38 N.J. 578, 186 A.2d 291 (1962). In coming to its "no-duty" conclusion in the context of whether the owner of a multi-family structure should provide police protection, the court's insightful observations concerning the complexities of proximate cause in negligent security cases are apropos to the case at bar:

> [I]t is fairly simple to decide how many ushers or guards suffice at a skating rink or a railroad platform to deal with the crush of a crowd and the risks of unintentional injury which the nature of the business creates, but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?

that the latter unreasonably *enhanced the risk of loss* due to theft by failing to supply [adequate security].

*Braitman v. Overlook Terrace Corp.*, 68 N.J. 368, 383, 346 A.2d 76 (1975) (emphasis supplied) (landlord failed to supply adequate lock on door to plaintiff's premises). Similarly, in holding a landlord who provided inadequate security liable for injuries sustained when a tenant was mugged in the hallway of an apartment house, the New Jersey Supreme Court affirmed a verdict for plaintiff wherein the trial court instructed the jury as follows:

> A landlord owes to his tenants the duty of exercising reasonable care to guard against foreseeable dangers arising from the use of premises in connection with those portions which remain within the landlord's control. The relationship between a landlord and his tenant does not impose upon the landlord the duty to protect a tenant from the crime of third persons. Only upon proper proof that the landlord *unreasonably enhanced the risk of the criminal activity* by failing to take reasonable measures to safeguard the tenants from foreseeable criminal conduct and a showing of suitable notice of existing defects to the landlord can a tenant recover damages from his landlord.

> \* \* \* \* \* \*

> Not only would there be uncertainty as to *when* the duty to furnish police protection arises and as to *what* measures will discharge the duty, there would also be exceptional uncertainty with respect to the issue of causation. This is so because of the extraordinary speculation inherent in the subject of deterrence of men bent upon criminal ventures. It would be quite a guessing game to determine whether some unknown thug of unknowable character and mentality would have been deterred if the owner had furnished some or some additional policemen. It must be remembered that police protection does not, and cannot, provide assurance against all criminal attacks, and so the topic presupposes that inevitably crimes will be committed notwithstanding the sufficiency of the force. Hence the question of proximate cause is bound to be of exceptional difficulty.

> *Id.*, 38 N.J. at 589–90, 186 A.2d 291. (emphasis in original).

*Trentacost v. Brussel*, 82 N.J. 214, 219, 412 A.2d 436 (1980) (emphasis supplied).

In a case where a store patron sought recovery against a supermarket for an assault and rape perpetrated in the establishment's parking lot, the New Jersey court rejected the defendant's argument that the failure to take reasonable security measures was not the proximate cause of plaintiff's injuries. The court opined that since the probability or likelihood of criminal attacks on the defendant's premises was reasonably foreseeable and could have been anticipated, "it is not unreasonable to infer that reasonable security measures [15] would have served as a deterrent, and that defendant's failure to take such measure constituted a substantial factor in the assault on plaintiff." *Atamian v. Supermarkets General Corp.*, 146 N.J.Super. 149, 159, 369 A.2d 38 (1976).

Although focusing on the "process" concerns involved in abrogating traditional "no-duty" rules, perhaps the most eloquent exposition of the etiology of proximate cause problems in the negligent security case is Professor Zacharias':

> Negligent security litigation presents significant process concerns. Foremost among these are problems of proving causation. For example, the landlord's failure to take security measures in the *Kline* context clearly facilitates crime as a whole. Yet in individual cases it is difficult to assess whether the landlord's omission contributes specifically to the victim's assault. Moreover, by definition, the criminal's conduct is an intervening cause of the injury. The jury's natural tendency to blur the issue of causation in the ordinary case is thus exacerbated in negligent security cases by the unusually speculative nature of the inquiry.
>
> To make matters worse, in deciding what security measures are reasonable and whether they would have been likely to prevent the injury, jurors must rely on factors that are not part of their everyday experience. The jury must consider, for example, the nature, cost, and operation of available security measures, how those relate to marketing of the landlord's rental units, and the statistical probabilities that the security measures will reduce specific types of crimes. The less jurors understand, the more likely they are to decide according to gut reactions and personal sympathies.
>
> Most of the cases rejecting negligent security liability have taken the causation issue from the jury. The courts have held as a matter of law either that the defendant's omission of security did not directly bring about the plaintiff's injuries or that the criminal conduct was a superseding cause. The courts' refusal to allow juries to decide causation issues normally within the jurors' province suggests that process concerns were on the judges' minds.

Zacharias, *supra* note 1 at 712–13 (footnotes and citations omitted).

We agree with the *Goldberg* court's notion that it is impossible to reduce to a moral certainty that any particular security device, or indeed all the security known to be available at any given moment, would have deterred a particular criminal. *See also Hall v. Fraknoi*, 69 Misc.2d 470, 330 N.Y.S.2d 637, 641 (N.Y.Civ.Ct.1972) (security system may have delayed criminal's entry but would not have prevented it). "Indeed, not even '[t]he most specialized and highly-trained government security personnel can predict and prevent these [criminal] incidents' with any guarantee of success, nor can it be proven that the criminal would not have injured someone else had the defendant protected the plaintiff." Zacharias, *supra* note 1 at 712–13 n. 88 (citation omitted).

Therefore, the best that a plaintiff can do, with respect to the proximate cause issue in a negligent security situation, is to prove that certain security devices or techniques, had they been implemented, would have reduced the *risk* of harm. However,

---

**15.** The court noted that "reasonable" security measures might have included a civilian safety patrol, greater utilization of security guards already used by defendants on a limited nightly basis, and the use of closed circuit TV. *Atamian, infra*, 146 N.J.Super. at 158, 369 A.2d 38.

this important and material clarification of "substantial factor" in the test for proximate cause became apparent to the Court for the first time at the post-trial stage of this matter. Such a formulation does not appear in the original Complaint, nor does it appear in the Joint Final Pre–Trial Order, the Trial Briefs, or the Requests for Charge. Consequently, the Court charged the jury as follows,[16] in accordance with the requests of the parties:

By proximate cause is meant that the wrongdoing or negligence of the defendants was an efficient cause of the incident. That is, a cause which necessarily set the other causes in motion and was a substantial factor in bringing about the incident. It is defined as a cause which naturally and probably led to and might have been expected to produce the result complained of.

The term proximate cause means that there must be no other culpable and efficient agency intervening between the defendants' negligence, their dereliction and the injuries and damages sustained by the plaintiffs.

An intervening cause is the act of an independent agency which destroys the causal connection between the negligence of the defendant and the wrongful injury. The independent act of being the immediate cause, in which case damages are not recoverable from the particular defendants because the original wrongful act is not the proximate cause of the injury. Defendant can only be held liable if the injury allegedly sustained by the plaintiffs could be foreseen by an ordinarily intelligent person as a natural and probable outcome of the act complained of.

The law does not require the parties to go beyond this in their relations with each other. Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, it follows that the amount of caution required in the use of reasonable care will vary with the nature of what is being done, and all the surrounding circumstances shown by the evidence in the case.

To put it another way, any increase in foreseeable danger requires increased care. In determining whether reasonable care has been exercised, you will consider whether the defendants ought to have foreseen, under the attending circumstances, that the natural and probable consequences of their acts or omissions to act, would have been some injury.

It is not necessary that the defendants have anticipated the very occurrence which resulted from their wrongdoing, but it is sufficient that it was within the realm of foreseeability that some harm might occur thereby. The test is the probable and foreseeable consequence that may reasonably be anticipated from the performance or the failure to perform a particular act. If a reasonable person under similar circumstances and by the use of reasonable care could have foreseen the result, that is, that some injury or damage would probably result and either would not have acted or if he did act, would have taken precaution to avoid the result, then the performance of the act or the failure to act, to take such precaution would constitute negligence. The fact that there is harm to the plaintiffs was attributable to the voluntary activity of others, not under the control of the defendants, does not preclude a finding of proximate cause if the harm by human intervention was foreseeable and a reasonable man so situated would take precautions to prevent it.

The criminality of the activity intervening between the defendants' act or failure to act and the injury to the plaintiffs is but one circumstance in the foreseeability of harm. Defendants' negligence may consist in the creation of a situation which involves unreasonable risk because of the foreseeable action of another.

---

16. Because the Court's charge is such an issue, we offer, albeit reluctantly, the lengthy excerpt which follows. To selectively edit or truncate portions at random would reversely distort the Court's explanation of proximate cause to the jury.

The plaintiffs, the Nebels, allege that the defendants' conduct at the time and place in question, was negligent in the following particulars:

The Nebels allege that the failure to provide a door lock in proper working order; the failure to provide warnings against the danger of daytime armed robberies in the area; the failure to provide any security patrol; and the failure to provide a fence or other perimeter barrier around the Airport Motor Inn or the failure to exercise reasonable care under the circumstances was a violation of the duty of the Airport Motor Inn to exercise reasonable care for the safety of the Nebels.

If you find that the defendants, were negligent in failing to warn the Nebels of recent daytime armed robberies in Atlantic City, or were negligent in failing to provide a security patrol, or, were negligent in failing to provide a properly operating door lock, or were negligent in failing to provide a perimeter barrier or a fence between the rooms along Filbert Avenue and the street, then you must find the Airport Inn negligent.

You need not find negligence in all these actions, you need only to find that the Airport Motor Inn was negligent in one in order to find the Airport Motor Inn negligent.

Now, members of the jury, if you find that the plaintiffs have proved by a preponderance of the evidence, that the defendants were negligent in the respects charged and that such negligence was a proximate cause of the incident in question, you then turn to a consideration of the damages ...

Trial Transcript at 24–28 (Oct. 3, 1988).[17]

Although the Court's charge is not incorrect in the strictest sense, it is not as clear as the interests of substantial justice demand. Additional amplification and elaboration on the essential "increased risk of harm" concept would have clarified the charge on proximate cause in a material way.

■ We believe that in light of the proper proximate cause standard, the jury's verdict was against the great weight of the evidence. The plaintiff's expert, Dr. Shellow, attested to his extensive education and credentials in the field of crime control and crime prevention. Dr. Shellow's analysis of the Inn's security practices led him to conclude that they were grossly inadequate in light of the significant risk of crime in the immediate vicinity. In his opinion, proper security at the Inn would have deterred the subject criminal activity and *a fortiori* the injuries suffered by the Nebels. By contrast, on cross-examination defendant's expert Mr. Chernikoff admitted that his education was in "poultry husbandry" and agricultural economics. In his opinion, the robbery was an "off the wall" event which the hypothetical security measures suggested by plaintiffs would have been ineffective in preventing.

The jury ascertained from the facts as presented at trial that the defendants were negligent. This notion is pregnant with meaning. It presupposes a conclusion that there was a duty to provide security to the Inn's customers and that defendants failed to fulfill that reasonable expectation, thereby exposing plaintiffs to a risk of harm which the Inn could have reasonably foreseen. Dr. Shellow professed that certain security measures would have reduced that risk, while Mr. Chernikoff opined that the crime is one that could not have been prevented.

We believe that the testimony and evidence proffered by plaintiffs at trial adequately demonstrated the existence of proximate cause consistent with our revised formulation of it in the negligent security context. By contrast, defendants' expert focused on whether additional security would have prevented the specific occurrence of the subject incident. This analysis missed the point on the causation issue and did not constitute a sufficient quantum of evidence to equal or outweigh plaintiffs' testimony and evidence. Consequently, the jury's verdict on proximate

---

17. The Court's charge on proximate cause was repeated in substantial part the following day at the jury's request. *See* Trial Transcript at 9–14 (October 4, 1988).

cause is against the weight of the evidence and to permit that verdict to stand without granting a new trial would result in a miscarriage of justice.

### B. *Failure to Rescue*

■ Plaintiffs' reliance on "failure to rescue" cases such as *Hake, supra,* as a representation of the proximate cause standard to be applied to the case at bar, is correct only insofar as it relates to the specific "duty to aid one in peril" aspect of this case.

The candid deposition testimony of the Inn's manager Morene Geno, which was uncontradicted at trial, revealed that during the course of the robbery, she and the Inn's houseman, John Gorczynski, were within eighteen inches of the hallway door to the Nebels' room. Ms. Geno apparently heard the shouting and commotion, but chose to ignore it, offering the following explanation for her actions:

I heard very loud arguing, didn't know who was in the room, wanted to knock on the door and tell them to knock it off. But, you know, if it stops within another couple of minutes, then we won't knock on the door, you leave well enough alone.

Deposition of Morene Geno, at 12, line 20. It takes no great leap of faith to surmise that had Ms. Geno intervened and entered at this critical juncture during the crime's commission, the entire incident may have been avoided. While we cannot say that such a course of conduct would surely have prevented either the robbery or the shooting of Mr. Nebel, the logic of our everyday experience tells us that an additional physical presence would have *increased the likelihood* of deterring the criminal activities of the perpetrators from that moment on. Indeed, even if such common intuition is wrong, in light of what we have already discussed concerning the traditional duty owed by an innkeeper toward his guest, the Inn had a duty to inquire about the unsettling turbulence taking place in the Nebels' motel room and at the very least *attempt* to intercede. Evidence presented at trial firmly established Atlantic City as a veritable holy Mecca of violent crime. A crime

such as the one which is the subject of this lawsuit is entirely foreseeable in light of the crime statistics admitted into evidence at trial. *See supra.* To conclude that the Inn's failure to intervene, once a disturbance on its premises is called to its attention, is not at least "a" (if not "the") proximate cause of the damages and injuries alleged is, in our opinion, a miscarriage of justice. Indeed, Ms. Geno's duty to inquire and intervene was a substantial one, having been entrusted with full responsibility for operating the Inn while its owners permanently reside in far-away London, England. *See supra.* Her passive role during the commission of the crime was a far cry from the traditional duty owed by an innkeeper to his guest.

### IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a new trial shall be granted. Having come to this conclusion, we need not determine the issues presented regarding compensatory and punitive damages for they will once again be addressed with the commencement of the new trial. An appropriate Order shall be entered in conformity with the Opinion of this Court.