**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0817-18

CAROL ANN CONFORTI,
individually and as administratrix
ad prosequendum of the estate of
KENNETH CONFORTI and
as parent natural guardian and
guardian ad litem of A.C., a minor,

 Plaintiff-Respondent/
 Cross-Appellant,

v.

COUNTY OF OCEAN, OCEAN
COUNTY BOARD OF CHOSEN
FREEHOLDERS, in their
individual and official capacities,
OCEAN COUNTY DEPARTMENT
OF CORRECTIONS, WARDEN
THEODORE J. HUTLER, in his
individual and official capacity,
and CORPORAL PETRIZZO,

 Defendants-Appellants/
 Cross-Respondents,

and

CORRECTIONAL HEALTH
SERVICES, LLC, PRISON

HEALTH SERVICES, INC., and
KELLY CLOUGH,

      Defendants.

_____

Argued March 24, 2021 – Decided August 2, 2021

Before Judges Sumners, Geiger, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2340-15.

Eliyahu S. Scheiman argued the cause for appellants/cross-respondents (Porzio, Bromberg & Newman, PC, and Berry, Sahradnik, Kotzas & Benson, attorneys; Eliyahu S. Scheiman, Thomas J. Reilly, Mary Jane Lidaka, and Christopher A. Khatami, on the briefs).

Donald F. Burke argued for respondent/cross-appellant (Law Office of Donald F. Burke, attorneys; Donald F. Burke and Donald F. Burke, Jr., on the briefs).

PER CURIAM

Following a jury trial arising from Kenneth Conforti's suicide while he was confined in the Ocean County Jail (OCJ or jail), defendants County of Ocean, Ocean County Board of Chosen Freeholders, Ocean County Department of Corrections (DOC), Warden Theodore J. Hutler, and Corporal Peter Petrizzo (collectively "the County defendants") appeal from a final judgment awarding

plaintiff Carol Ann Conforti $1,550,000.[1]  Plaintiff cross-appeals arguing that the trial judge James Den Uyl erred in his pre-trial summary judgment dismissal of her claims under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, seeking both compensatory damages and punitive damages.  Having considered the record, the parties' arguments, and the applicable law, we reject the appeal and cross-appeal and affirm all aspects of the final judgment.

I

On September 8, 2010, Kenneth,[2] while estranged from his wife, plaintiff Carol Ann, Administratrix ad Prosequendum of the Estate of Kenneth Conforti and Parent Natural Guardian and Guardian ad Litem of A.C., a minor, was arrested and jailed for violating a restraining order by breaking into the former marital home to see his nine-year-old son A.C., who is deaf and afflicted with Down's Syndrome.  At his OCJ intake, the forty-five-year-old Kenneth advised a CHS staff member that he was experiencing feelings of hopelessness and

---

[1]  Defendants Correctional Health Services, Inc. (CHS), a contractor providing medical and mental health services to OCJ inmates, its successor-in-interest Prison Health Services, Inc., and its employee Kelly Clough settled with plaintiff prior to trial.  (2T31;4T18;4T90-4T93;9T127).  We refer to them collectively as the "CHS defendants."

[2]  To avoid confusion, we refer to him by his first name because he shares a last name with plaintiff.  We mean no disrespect.

helplessness because of: (1) the deterioration of his marriage; (2) his inability to control his alcoholism and daily consumption of a half-gallon of vodka; and (3) unsuccessful back surgery leaving him in pain and with rods and screws in his back. He denied having any thoughts of suicide or that he had ever been diagnosed with depression. Kenneth was consequently kept in the OCJ's medical housing unit under critical observation because of alcohol withdrawal and was prescribed medication for five days to mitigate his withdrawal symptoms. He was also scheduled for a psychiatric evaluation.

On September 10, Kenneth was cleared for housing in the jail's general population and was provided a doctor's order giving him an extra mattress and pain medication and directing that he was not to work or be assigned to a top bunk. Kenneth was released from OCJ on October 4.

Over a week later, on October 13, Kenneth was arrested again and returned to OCJ because he went back to the marital home. Clough, a CHS nurse, conducted Kenneth's intake but did not review his September intake paperwork and took him at his word that he had never been previously jailed. He denied any medical or mental health issues or any feelings of hopelessness or helplessness and claimed that he only drank socially. Yet, because Kenneth was given the same inmate number he had during his recent jailing, his records from

A-0817-18

that confinement were readily available to Clough to contradict his representations. Kenneth was not referred by medical staff as a suicide risk.

CHS progress notes dated October 14 revealed

> [Kenneth] was last seen [September 10] for same offense. [He] has no psych[iatric] [history]. He has a [history] of binge drinking but denies recent use. [He] denies any current sui[cidal] harm. He is alert w[ith] relevant thought process. No current mental health issues/concerns. [He is] psych[ologically] clear for general population.

On October 16, Kenneth filled out a medical/dental request form requesting "medical" attention for "back pain." Two days later, Clough wrote on the bottom of the form "you can order [M]otrin or Tylenol from commissary."

On October 20, Corporal Petrizzo, filling in as a floor officer in Kenneth's housing unit, was required to walk the 130-inmate units once every hour and perform health and welfare checks to ensure that the inmates were safe and abiding by OCJ policies. This included making sure nothing was obscuring cell door windows. Records showed that the officer made his checks at 8:03 a.m., 9:02 a.m., 9:56 a.m., 11:02 a.m., and 12:03 p.m.

At 9:32 a.m., Kenneth wrote a suicide note to his parents. At some point thereafter, he shut the door to his cell, causing the door to lock automatically,

5

and placed a sheet over the cell door window. He then tied bedsheets together and hung himself from a ceiling light fixture over the toilet.

Just before 1:00 p.m., inmate Edward Soto spotted Kenneth hanging in his cell. Soto thought Kenneth was alive because his eyes were open. After the cell was unlocked, Kenneth's body was taken down and CPR was performed, but he could not be revived. At 1:24 p.m., emergency medical personnel arrived and within minutes took Kenneth to the hospital. At 1:47 p.m., doctors declared Kenneth dead. An autopsy confirmed that he died of asphyxiation by hanging.

Exactly when DOC staff first responded to the suicide was unclear because the relevant timed entry in the health and welfare log was overwritten. The log was maintained by an officer in the West Tower control room tower, and any change was supposed to be initialed and reported to a supervisor. Although the log reflected that Petrizzo began his check at 12:03 p.m., the entry that followed was obliterated and overwritten with an entry that noted a 12:55 p.m. "possible suicide." The DOC admitted that someone tampered with the log. Surveillance cameras in the housing unit were not positioned to look inside cells. Nonetheless, the recordings could have revealed the activities of jail staff and decedent prior to the suicide. However, although the DOC produced copies of the recordings in 2016, they could not be viewed because they were

6

incompatible with the new technology at the jail. The DOC insisted that there was no intentional tampering with the recordings. Notably though, the 2010 surveillance system was put in by vendor Black Creek, and, as of the date of trial, they remained the contractor.

Plaintiff filed suit seeking compensatory and punitive damages, including punitive damages against the County defendants alleging Kenneth's suicide was the result of their negligence, and violations of the NJCRA, the Wrongful Death Act (WDA), N.J.S.A. 2A:31-1 to -6, and the New Jersey Survival Act (SA), N.J.S.A. 2A:15-1 to -6. The County defendants denied plaintiff's claims and asserted immunity under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to -13-10.

Prior to trial, the County defendants moved for summary judgment dismissal of the lawsuit. Judge Den Uyl granted partial summary judgment to the County defendants, dismissing plaintiff's NJCRA and punitive damages claims.

Trial occurred over several days in June 2018. At the conclusion of plaintiff's case, the County defendants unsuccessfully moved for a directed verdict. The jury later returned a verdict in favor of plaintiff, awarding her $150,000 in WDA damages and $1,400,000 for pain and suffering under the SA,

A-0817-18

finding the County defendants sixty percent liable and the CHS defendants forty percent liable. The County defendants unsuccessfully moved for judgment notwithstanding the verdict (JNOV), or, alternatively, a new trial or remittitur.

## II

We first address the County defendants' contention that Judge Den Uyl erred in denying their pre-trial, trial, and post-trial motions to dismiss plaintiff's negligence claims. The judge denied summary judgment, ruling that plaintiff had presented sufficient evidence to raise an issue of material fact as to whether special circumstances were present, decedent's suicide was foreseeable, and the County defendants were negligent. In denying the County defendants' motion for JNOV, the judge rejected their argument that they were entitled to TCA immunity, determining the OCJ was not a "medical facility" given immunity for certain actions under N.J.S.A. 59:6-4, -5, and -6. Medical facilities were limited to "a hospital, infirmary, clinic, dispensary, mental institution or similar facility," N.J.S.A. 59:6-1, and do not include a jail's medical intake process and services. By contrast any protections for "Corrections and Police Activities" were specifically addressed in N.J.S.A. 59:5-1 to -6 (Da21). As for the TCA's general immunity provisions, N.J.S.A. 59:2-1, and -2(b), N.J.S.A. 59:-3-2(a)

and -3-5, and N.J.S.A. 59:5-1, the judge determined that the County defendants could not overcome the clear ruling "in Hake [v. Manchester Twp., 98 N.J. 302, 318 (1985)], wherein [our] Supreme Court approved the trial court's charge that 'expressly permitted the jury to find liability if the suicide was foreseeable.'"

Before us, the County defendants contend that they were entitled to absolute immunity under N.J.S.A. 59:6-4 (failure to make physical or mental exam), N.J.S.A. 59:6-5 (failure to diagnose mental illness or substance abuse), and N.J.S.A. 59:6-6 (determination on terms of confinement). They assert that such immunities applied because plaintiff's "overarching claim" was that they committed psychiatric and medical malpractice in failing to diagnose Kenneth's severe depression, alcoholism, and back pain, and, thereby not recognizing him as a suicide risk when assigning him to a cell in the OCJ's general population.

The County defendants' arguments misconstrue plaintiff's claims against them. The thrust of plaintiff's claims alleges that they failed to follow DOC policies and rules for the prevention of inmate suicide. Plaintiff's corrections liability expert, Martin Horn, testified that a prisoner such as Kenneth was totally dependent on jail administration to keep him safe from other inmates and himself. After detailing nationally recognized suicide prevention protocols, OCJ suicide records between 2005 and 2010, and OCJ's suicide prevention

policy and training materials, Horn opined the County defendants were negligent by: (1) failing to reexamine DOC suicide prevention policy; (2) relying upon an inadequate suicide prevention policy; (3) offering inadequate staff training; (4) failing to follow or enforce their own policies, such as keeping cell windows unobscured, performing random patrols and maintaining an accurate log; and (5) failing to accurately track the number of suicides at the OCJ. Horn testified that if DOC staff had followed policies, the risk of Kenneth committing suicide would have been substantially lowered or prevented. Because they had not done so, Horn asserted that the County defendants DOC staff had exhibited deliberate indifference towards Kenneth.[3]

Moreover, given the jury's assessment of forty percent liability on the CHS defendants who conducted Kenneth's jail intake, the County defendants'

---

[3] In contrast, defense expert Jeff Eiser opined that: (1) there was no evidence that anyone at OCJ had actual knowledge that Kenneth was going to kill himself; (2) DOC staff did not disregard risk or exhibit deliberate indifference to the safety or mental health of Kenneth; (3) Kenneth had the opportunity to see a mental health professional; (4) Kenneth was housed appropriately in October 2010; and (5) the OCJ staff was adequately trained and there was no evidence that a lack of training contributed to Kenneth's death. (5T187). Eiser emphasized that a jail could still have suicides despite following all applicable policies.

contention that the jury verdict should be set aside because they are not liable for a failure to diagnose is without support. Seemingly, the jury held the CHS defendants were liable for misdiagnosing Kenneth's mental condition, not the County defendants. And because N.J.S.A. 59:6-4 provides immunity for medical services to a very specific set of public health examinations not applicable here, the County defendants have no immunity regarding Kenneth's medical intake, which was done to assess his OCJ confinement and not conducted for treatment purposes. See Parsons v. Mullica Twp. Bd. of Educ., 440 N.J. Super. 79, 87 (App. Div. 2015) (holding that except for the purpose of treatment, N.J.S.A. 59:6-4 provides immunity to public entities and public employees involving inadequate public health examinations, i.e., "public tuberculosis examinations" and "eye examinations for vehicle operator applicants," to protect the public and the examined person).

The County defendants also contend the judge erred in not affording them discretionary act immunity under N.J.S.A. 59:2-3(a) and N.J.S.A. 59:3-2(a) (Db36-Db41). We disagree.

Public entity immunity is the general rule under the TCA and liability is the exception. Lee v. Brown, 232 N.J. 114, 127 (2018). The TCA states:

> a. Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury

11

arises out of an act or omission of the public entity or a public employee or any other person.

b. Any liability of a public entity established by this act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person.

[N.J.S.A. 59:2-1.]

N.J.S.A. 59:2-3(a) states that "[a] public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity."  "A discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed."  S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 230 (App. Div. 2012) (alteration in original) (citation omitted).  Based on our review of the record, defendants did not present any evidence that their actions relating to Kenneth's suicide involved the exercise of discretionary acts.  There was no testimony regarding competing demands that forced the DOC staff to make one decision or another related to Kenneth's suicide.

Furthermore, N.J.S.A. 59:2-3(d) provides, that "[n]othing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions."  We have defined "a

ministerial act [a]s 'one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.'" S.P., 428 N.J. Super. at 231 (quoting Morey v. Palmer, 232 N.J. Super. 144, 151 (App. Div. 1989)).  Our review of the record reveals no evidence presented by the County defendants that their failure to perform a discretionary act was a contributing factor in Kenneth's suicide.

III

The County defendants argue that plaintiff failed to establish their "medley of negligence claims" were the proximate cause of Kenneth's suicide. (Db46).  They maintain "[p]laintiff failed to introduce any expert psychiatric testimony regarding [their] failure to recognize and properly respond to [Kenneth's] physical and mental health problems."  (Db46-47).  The County defendants point out the jury was thus unable "to undertake an informed analysis regarding whether [Kenneth's] suicide followed logically from[] and was . . . proximately caused by [their] negligence."  (Db 54).

In Hake, the Court recognized that "'[s]pecial circumstances' form the basis of most decisions involving a jailer's liability for a prisoner's acts of self-destruction."  98 N.J. at 318.  The arrest and jailing of a teenager under "the

13

influence of alcohol or . . . depression" close to the Christmas holiday constituted "special circumstances of care" that required heightened scrutiny of him. Ibid. Liability is imposed on the defendant jailer based on "[o]ur concepts of causation for failure to act . . . [where] the conduct may be viewed as a 'substantial factor contributing to the loss.'" Id. at 311 (quoting Francis v. United Jersey Bank, 87 N.J. 15, 44 (1981)). "Proximate cause consists of 'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Conklin v. Hannoch Weisman, 145 N.J. 395, 418 (1996)). "Proximate cause has been described as a standard for limiting liability for the consequences of an act based 'upon mixed considerations of logic, common sense, justice, policy and precedent.'" Fluehr v. City of Cape May, 159 N.J. 532, 543 (1999) (quoting Caputzal v. The Lindsay Co., 48 N.J. 69, 77-78 (1966)).

Here, the judge—with no objection from the defense—charged the jury on what it must determine to find the County defendants liable for Kenneth's suicide. After stating the County defendants' responsibility to the inmates under their control and the negligence standard, the judge advised jurors "[t]o find proximate cause, [they] must first find the [County] defendant[s'] negligence

was a cause of the suicide," and if they do, they "must find the defendant's negligence was a substantial factor that singly or in combination with other causes brought about the suicide. By substantial it is meant that it is not a remote, trivial or inconsequential cause."

Contrary to the County defendants' assertions, plaintiff presented relevant evidence showing their knowledge of the increased risk of jail suicides, the OCJ's history of numerous suicides and suicide attempts, and their apparent limited response. Equally important, plaintiffs provided direct evidence of proximate causation where the County defendants failed: (1) to recognize Kenneth had been incarcerated just a week earlier at the OCJ and that relevant records offering insight into his physical and mental conditions were accessible to determine his custody status; (2) to adequately respond to Kenneth's medical needs; (3) to enforce precautionary measures designed to ensure inmate safety, such as varying the time of health and welfare checks, which allowed Kenneth to find an opportunity to hang himself; and (4) to notice by direct observation from the control tower or by indicator light that decedent had closed and locked his cell door and obscured his cell door window enabling him to hang himself without being seen or interrupted. Moreover, defendants disregard that the conveniently overwritten log entry and unavailable security footage allowed the

15

jury to infer culpability from the actual timing of the welfare checks; the amount of time Kenneth's cell door was closed, locked, and obstructed; and the time it took DOC staff to respond to the hanging.

We also conclude there was no error in the judge's denial of the County defendants' motion for JNOV based on his reasoning "there was sufficient evidence from which a jury could make the legitimate inference that [Kenneth's] suicide was reasonably foreseeable to the County [d]efendants and that [their] actions were a proximate cause of [Kenneth's] death based on the testimony of [p]laintiff's expert, Martin Horn."

IV

The County defendants next argue the judge erred in not granting their JNOV motion to dismiss plaintiff's SA claim because the period for recovery of conscious pain and suffering damages was limited to the time between the act of hanging and death, and there was no lay or expert testimony establishing that decedent was conscious and experiencing pain and suffering during this period. They maintain the only evidence of any pain Kenneth experienced was related to his back injury, which was not compensable under the SA and, as such, the jury award of $1,400,000 must be set aside.

Damages for pain and suffering are permitted under the SA, but only if

the decedent experienced conscious pain and suffering between the time of the injury and his or her death.  Smith v. Whitaker, 160 N.J. 221, 236 (1999).  It is essential for a successful pain and suffering claim that the pain and suffering be consciously experienced.  Carey v. Lovett, 132 N.J. 44, 67 (1993).  Additionally, damage awards for pain and suffering may not be based on mere speculation or conjecture.  See Model Jury Charge (Civil), 1.12(O), "Damages." ("The plaintiff has the burden of proving each item of damages that he/she claims [such as, that death was not instantaneous].");  Smith v. Whitaker, 313 N.J. Super. 165, 186 (App. Div. 1998) (citing John P. Ludington, Annotation, When Is Death "Instantaneous" for Purposes of Wrongful Death or Survival Actions, 75 A.L.R.4th 151, § 2(b), at 158-59 (1990)).  Nonetheless, our Supreme Court acknowledged there is "a presumption that life continues 'until evidence is presented sufficient to establish that death occurred at some specific time.'"  Smith, 313 N.J. Super. at 187 (quoting Hake, 98 N.J. at 312 n.3).[4]

In Hake, the Court specifically addressed the impending death caused by hanging stating:

> A hanging victim ordinarily dies from asphyxia or loss
> of oxygen to the brain resulting from the strangulation.
> The process of dying spans an undefinable amount of

---

[4]  The Court also recognized that "[w]hile death rarely may be instantaneous in fact, instantaneous death can occur."  Id. at 188.

time, but there are two factors that weigh heavily in the determination. These factors are "the severity of the constricting force and the point of application of that force." J. Glaister & E. Rentone, "Hanging," Medical Jurisprudence and Toxicology, p. 166 (12th ed. 1966). The effect of these two factors produces variables of as much as several minutes in the time necessary for death to occur. Id. at 166-67. In general, however, when death occurs from asphyxia, "the heart continues to beat for a few minutes after the cessation of respiration, and, therefore, artificial respiration on a suspended person may prove successful if the body is cut down within five or six minutes after the commencement of suspension. [Id. at 167.]"

[98 N.J. at 312-13. (alteration in original).]

In rejecting the County defendants' argument to dismiss plaintiff's pain and suffering claim, Judge Den Uyl reasoned that based on the holdings in Smith, Falzone v. Busch, 45 N.J. 559, 569 (1965) ("where negligence causes fright from a reasonable fear of immediate personal injury, which fright is adequately demonstrated to have resulted in substantial bodily injury . . . [damages are recoverable] if such bodily injury . . . occurred as a consequence of direct physical injury rather than fright"), and other jurisdictions, the jury could infer that Kenneth had some pain and suffering and some brief but distinct anticipation of his impending death. The judge found:

In this case, [d]efendants[1] reading of the [Survival Act] is too narrow and restrictive and not supported by the plain language of the statute which allows the estate to

18

recover for "injuries for which the deceased would have had a cause of action if he had lived" and, in addition, "to damages accrued during the lifetime of the deceased." Hypothetically, "if he had lived" following a failed suicide attempt because the ligature broke, [Kenneth] would have a viable damage claim for the emotional distress or stress that precipitated the extreme act of attempting to take his life. It would be a claim that "accrued during his lifetime." There is no support for [d]efendants' assertion that the claim for damages accrued when [decedent] started hanging from the light fixture in his cell in the context of suicide.

. . . .

A juror may not know from his or her personal experience the nature of pain and suffering incident to suicide. However, by common knowledge and common experience they understand and appreciate the strong basic human instinct to survive. Without the benefit of expert testimony, they can reasonably infer the depths of emotional distress and stress to which a person sinks to plan and orchestrate their own death.

In sum, the judge found that because Kenneth died of asphyxiation, "[t]he testimony of an eye[]witness or medical expert extrapolating on death by asphyxiation would have been helpful but was not required for the jury to draw such an inference."

We conclude the jury's award on pain and suffering pursuant to the Survival Act was not speculative and permissible under Smith and Hake based

on Kenneth's death by asphyxiation from hanging. Accordingly, the judge's ruling should not be overturned.

V

In her cross-appeal, plaintiff contends Judge Den Uyl erred in granting summary judgment dismissal of her NJCRA claim for compensatory and punitive damages. She asserts that based upon inadequate training, the high rate of inmate suicides, and knowledge of Kenneth's medical needs, the County defendants were deliberately indifferent to the deprivation of Kenneth's rights, privileges, or immunities secured by the state law, the New Jersey Constitution, Article I, paragraph 12, and the Eighth Amendment of the United States Constitution.

In granting summary judgment to the County defendants on plaintiff's NJCRA claims, the judge explained in his written decision:

> The evidence presented, when viewed in the light most favorable to [p]laintiff, would not permit a rational fact finder to infer the conduct of the . . . County [d]efendants violated [Kenneth's] constitutional rights. The evidence does not support the level of culpability required for a violation under any of the theories presented nor the characterization of the conduct by [p]laintiff's expert as "deliberate indifference." These reasons include that the medical and mental health services at the [OCJ] were provided

20

by the [CHS defendants]. During the initial booking process, medical and mental health screenings and assessments were contracted by the medical provider. Their personnel made the determination as to whether an inmate is suicidal. The [OCJ] policies and procedures manual contains a section on suicide prevention. Corrections officers at the [OCJ] conducted regular health and welfare checks of inmates. Corrections officers at the [OCJ] received in-house training with regard to suicide prevention in October or November each year. The training at the OCJ was continual and included suicide prevention training by the psychiatric staff. The OCJ suicide prevention policy was reviewed by the warden on an annual basis. Health and welfare checks were conducted in accordance with the N[ew] [J]ersey Administrative Code . . . . In 2010[,] the OCJ was accredited by the National Commission on Correctional Health Care . . . . The OCJ also passed the state inspection. The initial intake and mental health screening evaluations were completed by employees of . . . [CHS] and [Kenneth] was not identified as a suicide risk and was cleared for general population.

We review a ruling on a summary judgment motion de novo, applying the same standard governing the motion court. N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 452 (App. Div. 2019) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). A motion judge should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the

moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In deciding whether a genuine issue of material fact exists, "the motion judge must 'consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). However, this court owes "no deference to the motion judge's conclusions on issues of law." Bove v. AkPharma Inc., 460 N.J. Super. 123, 138 (App. Div. 2019) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). We consider these principles when addressing plaintiff's arguments to overturn the summary judgment order.

The NJCRA in pertinent part states:

> Any person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c).]

22

Thus, the NJCRA provides a cause of action to any person who has been deprived of any rights under either the federal or state constitutions by a "person" acting under color of law.  Ibid.  It "is not a source of rights itself." Lapolla v. Cnty. of Union, 449 N.J. Super. 288, 306 (App. Div. 2017) (citing Gormley v. Wood-El, 218 N.J. 72, 97-98 (2014)).  By its terms, "[t]wo types of private claims are recognized under this statute: (1) a claim when one is 'deprived of a right,' and (2) a claim when one's rights have been 'interfered with by threats, intimidation, coercion or force.'"  Ibid. (quoting Felicioni v. Admin. Off. of Cts., 404 N.J. Super. 382, 400 (App. Div. 2008)).

The NJCRA, modeled after the Federal Civil Rights Act, 42 U.S.C. § 1983, affords "a remedy for the violation of substantive rights found in our State Constitution and laws."  Brown v. State, 442 N.J. Super. 406, 425 (App. Div. 2015) (quoting Tumpson v. Farina, 218 N.J. 450, 474 (2014)), rev'd on other grounds, 230 N.J. 84 (2017).  The NJCRA has been interpreted by our Supreme Court to be analogous to Section 1983; thus, New Jersey courts "look[] to federal jurisprudence construing [Section 1983] to formulate a workable standard for identifying a substantive right under the [NJCRA]."  Harz v. Borough of Spring Lake, 234 N.J. 317, 330 (2018).

A governmental unit "may not be sued under [Section] 1983 [and by

extension, the NJCRA] for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). It cannot be held liable for the actions of its employees solely based on the doctrine of respondeat superior. Id. at 691-95. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983 [and by extension, the NJCRA]." Id. at 694. See Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 565 (2010) (stating that a municipality can "be held liable for acts committed by one of its employees . . . pursuant to a governmental policy or custom . . . that violate[s] the Constitution").

A plaintiff can show the existence of a policy or custom by presenting proof that the municipality: (1) adopted an official policy that deprived citizens of their constitutional rights; (2) tolerated or adopted an unofficial custom that deprived citizens of their constitutional rights; or (3) failed to affirmatively act to train or supervise its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights, although the need to do so was obvious. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir.

2003). However, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick v. Thompson, 563 U.S. 51, 61 (2011) (alteration in original) (quoting Canton v. Harris, 489 U.S. 378, 388 (1989)).

It is only when officials are "on actual or constructive notice that a particular omission in their training program [is causing public] employees to violate citizens' constitutional rights," that the public employer "may be deemed deliberately indifferent" if the program is retained. Ibid. (citation omitted). This inaction in spite of notice "is the functional equivalent of a decision by the city itself to violate the Constitution." Id. at 61-62 (quoting Canton, 489 U.S. at 395).

The suicide of a pretrial detainee can support a recovery in a Section 1983 action if: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991).

"Particular vulnerability to suicide" means that there must be "a strong

likelihood, rather than a mere possibility, that self-inflicted harm will occur." Id. at 1024. "[S]hould have known" refers to more than "a negligent failure" to recognize a high risk of suicide, but "less than a subjective appreciation of that risk." Id. at 1025. Rather, "the risk of self-inflicted injury" must be both "great" and "also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Ibid.

To establish municipal liability for an alleged "failure to train" claim brought in the context of a prison suicide, a plaintiff cannot simply show that the "employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." Id. at 1029-30. Rather, a plaintiff must: (1) identify the specific training not provided that could reasonably be expected to prevent the suicide that occurred and (2) demonstrate that the "risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." Id. at 1030.

There is no merit to plaintiff's contentions that her NJCRA claim should not have been dismissed on summary judgment. Plaintiff did not demonstrate

26

that the County defendants had a de facto policy, practice, or custom of discouraging the prevention of suicides by OCJ inmates that deprived Kenneth of his rights. As noted above, we concluded there was no basis to disregard the jury verdict that the County defendants' negligence was the proximate cause of Kenneth's suicide. Nevertheless, plaintiff did not establish a prima facie NJCRA claim to avoid summary judgment dismissal as there was no showing the County defendants' conduct satisfied the statute's higher standard that the existence of a policy or custom at the OCJ evidenced a deliberate indifference towards the strong likelihood that Kenneth would commit suicide. Moreover, identifying and addressing Kenneth's particular medical needs during his OCJ confinement was, for the most part, the responsibility of the settling CHS defendants whom the jury assessed forty percent negligent for his suicide.

To the extent we have not addressed any of the parties' arguments raised on appeal or cross-appeal, it is because we have determined that they are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27